SCHWEIGER CONSTRUCTION
COMPANY, INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 98–769C.

United States Court of Federal Claims.

March 9, 2001.[1]

1. Opinion was originally filed January 5, 2001,     unpublished.

Denise E. Farris, Kansas City, Mo., for the Plaintiff. Sharon Kennedy, Kansas City, Mo., of counsel.

Monica J. Palko, Washington, D.C., with whom were Kirk T. Manhardt, Assistant Director, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, David W. Ogden, Acting Assistant Attorney General, for the Defendant. Michael T. Brincks, Office of Regional Counsel, U.S. General Services Administration, of counsel.

## OPINION

BUSH, Judge.

This matter, before the court on defendant's motion to dismiss; plaintiff's motion to lift the stay of discovery; and plaintiff's motions to dismiss part of Count V and Count VI without prejudice, involves an indefinite-quantity construction contract (IDQ contract) between Schweiger Construction Co. (Schweiger) and the General Services Administration (GSA). Schweiger was to provide construction services in GSA owned or leased buildings in Kansas City, Missouri. In this litigation, plaintiff seeks additional compensation for work it performed under the contract, alleging that it suffered damages resulting from the inaccuracy of the government's estimates and its inclusion of a complex construction project into the contract. For the reasons set forth below, the government's motion to dismiss is denied; Schweiger's motion to lift the stay of discovery is granted; and count V, insofar as it seeks prospective injunctive relief, and count VI are dismissed with prejudice.

## BACKGROUND [2]

The GSA issued Solicitation No. GS–06P–96–GYD–0010 for what was defined as an "Indefinite Quantity Term Construction Contract" on February 12, 1996. This solicitation sought sealed bids from qualified small businesses. According to the GSA, the work under the contract was to involve "relatively small, repetitive, unscheduled construction services in GSA owned or leased buildings in the Kansas City metropolitan area where, based on past needs or requirements, the government expected similar services would be required during the contract term." Compl. ¶ 6. Within the solicitation, there was a price schedule and estimated quantities delineating the prices and quantities for each item of labor and material to be factored into the bid.

The solicitation instructed that bidders were to include all items delineated on the Price Schedule and Estimated Quantities

(the estimates) in their bids, and that modification of the unit prices or estimates would constitute grounds for rejecting the bid. Each bidder was to submit a bid factor, which was to include the bidder's overhead, profit and all other contingencies. This bid factor is the quotient that would yield the lowest per unit price when multiplied by the unit prices for each item delineated on the Price Schedule and Estimates Quantities. Pursuant to the solicitation, the low bidder would be the responsible bidder submitting the lowest bid factor.

The solicitation states that only an estimated " '10 percent of the work under this contract will be performed during other than normal working hours or days.' " Compl. at ¶ 12. It defined "normal working hours" as 8:00 a.m. through 5:00 p.m. Id. The contract also provided that "[c]ontractors shall not be allowed any adjustment in the contract schedule prices(s) for interior work performed during other than normal working hours." Motion to Dismiss at 5 (quoting Compl. Exhibit 9 at 01010–4). Schweiger avers that in calculating its bid factor it relied upon: (1) the aforementioned Price Schedule and Estimated Quantities; and (2) the GAO's "warranty" that no more than ten percent of the work would have to be performed outside normal working hours. Schweiger further notes that, according to the GAO, such reliance is the most realistic method of computing a fair and reliable bid factor in IDQ contracts.

Originally, the low bid factor was submitted by R & R International, Inc. Schweiger protested the award on the grounds that R & R was not a "small business" that qualified for the award of the contract, and the protest was upheld. Thus, Schweiger, which had submitted the second low bid factor of .8316, was awarded the contract on May 30, 1996.

On June 12, 1996, Schweiger received its Notice to Proceed. The term of the contract was for one year, with two one-year options. The contract incorporated Federal Acquisi-

---

**2.** The defendant has agreed to accept the plaintiff's well-pled factual allegations as true for the purposes of the resolution of its pending motion to dismiss. The court has included certain facts presented by the defendant solely to clarify aspects of the contract that were not presented by the plaintiff in its complaint.

tion Regulation (FAR) clause 52.216–22, "Indefinite Quantity," which provides:

> This is an indefinite quantity contract for the supplies and services specified, and effective for the period stated in the Schedule. The quantities of supplies and services specified in the Schedule are estimates only and are not purchased by this contract.

Motion to Dismiss at 3 (citing Compl. Exhibit 27, p. 00800–5; 48 C.F.R. § 52.216–22 (1984)). The contract specified the contractual minimum as being $175,803.15 and the maximum as $2,637,032.29. It also provided:

> The Contractor shall furnish to the government, when and if ordered, the supplies or services specified in the schedule up to and including the quantity designated in the Schedule as the "maximum." The government shall order at least the quantity of supplies or services designated in the Schedule as "minimum."

*Id.* at 3–4 (quoting Compl. Exhibit 27, p. 00800–5).

The contract further states:

> The contractor shall perform work included in approved Delivery Orders at or above the minimum order which does not exceed the maximum limit. If the requirements for services set forth in the solicitation do not result in orders in dollar amounts or quantities described in the solicitation as estimated or maximum, this event shall not constitute the basis for a price adjustment under this contract.

*Id.* at 5 (quoting Compl. Exhibit 9 at 01010–3).

Schweiger avers that in August of 1996, the GSA first notified it of the government's intent to include a Social Security Administration (SSA) remodeling project as part of the contract, but did not describe the intended scope of the project.

Schweiger states that the objective of this project was to provide

> 'contractual support to one of GSA's tenant agencies, the Social Security Administration . . . [which] was (and is) in the process of upgrading approximately 1600 employee work stations on 8 floors of the Bolling Federal Building through the installation of new systems, furniture and networked personal computers. The systems furniture installation services were being acquired through a nationwide SSA contract.'

Compl. at ¶ 29 (quoting Compl. Exhibit 8, Memorandum of Law at 3).

GSA provided support for the Social Security Administration project through its contract with Schweiger. Furthermore, according to Schweiger, the GSA has admitted it knew of the SSA project prior to the solicitation. Schweiger contends GSA admitted that the SSA project was required to conform with a tightly coordinated schedule, and as such the construction, timing and sequencing requirements involved were extensive. The contract between SSA and the furniture installers was affected by a separately negotiated union contract that required the systems furniture to be completely installed ninety days before the arrival of the computers. Because of these requirements, GSA required 100% of Schweiger's work in the Bolling Federal Building to be performed outside normal working hours, despite the fact that the contract estimated no more than ten percent of the work would need to be performed outside of normal working hours. Further, Schweiger alleges that it had to provide "design build" services to permit this extensive project to progress quickly. Schweiger states that because the SSA renovation was not specifically described in the IDQ specifications, it could not factor in the after-hours work requirements or the design-build services when computing its bid.

Pursuant to the terms of the contract, Schweiger could refuse a delivery order in the event that it exceeded $100,000. The initial delivery order for the Social Security Administration Project, # P0697TD0015, was submitted on November 19, 1996 in the amount of $99,961.39. It was later modified to reflect a construction value of $298,239.18. The second delivery order for the SSA project, # P0697TD0038, was submitted on April 9, 1997 for $264,270.20. The third order for the SSA project, # P0697TD0050, was submitted on May 27, 1997 in the amount of $282,989.59. These were the only orders submitted under the contract.

After a nine month study of its contract performance figures, Schweiger ascertained that the cumulative orders under the contract were vastly different than the estimates set forth in the Price and Estimated Quantity Schedule. Following extensive comparisons of the estimates versus the government's actual orders, Schweiger determined there were line item variances as great as 7894%. Schweiger concluded that continuing performance at its bid factor of .8319 would result in devastating financial loss. Accordingly, on April 25, 1997, Schweiger submitted its preliminary request for equitable adjustment. Schweiger believed such a modification would equalize the risk allocation for large-scale orders not reflected in the original schedule.

Shortly thereafter, on May 12, 1997, during the pendency of Schweiger's request for equitable adjustment, the GSA notified Schweiger of its intent to exercise the first year option on Schweiger's contract. This request actually fell outside of the permissible time frame for exercising the option. Schweiger elected not to continue performance of the contract due to what it believes were quantity deviations, the addition of design-build services, and an increase in work required to be performed after hours from an estimated ten-percent to more than sixty-five percent, as ordered.

Accordingly, on June 12, 1997 the contract terminated. On June 17, 1997, the GSA denied Schweiger's request for equitable adjustment. This denial was based on Section 01010, Item 2.F.5 of the contract, which provides:

> The Contractor shall perform work included in approved Delivery Orders at or above the minimum order which does not exceed the maximum limit. If the requirements for services set forth in the solicitation do not result in orders in dollar amounts or quantities described in the solicitation as estimated or maximum, this event shall not constitute the basis for a price adjustment under this contract.

Compl. at ¶ 53; Denial of Request for Equitable Adjustment.

Schweiger undertook a study comparing the actual quantity of line items ordered for the first three floors of the SSA project with the estimates and found that, in certain instances, contract line items were increased between 1000% to over 24,400%.

Schweiger states that on July 25, 1997, it was verbally notified of GSA's intent to award the remaining two options of the contract to Repairs Unlimited, which was the third low bidder on the original solicitation. On July 28, 1997, Schweiger submitted its written protest to GAO, arguing that the award to Repairs Unlimited circumvented the competitive bid process; violated the Competition in Contracting Act; and "perpetuated performance of a contract based on fraudulent specifications." Compl. at ¶ 67. On August 4, 1997, Schweiger submitted its Certified Claim to the GSA. This claim was denied by GSA on October 2, 1997. On September 9, 1997, Schweiger submitted its reply to GSA's response to its protest, and supplemented the protest on September 23, 1997. The GAO denied the bid protest as untimely. Subsequently, Schweiger submitted a Motion to Reconsider GAO's Dismissal of Protest, which was denied, and a Final Certified Claim, for which reconsideration was denied.

Schweiger states that it submitted a Freedom of Information Act request to obtain information about the previous contractor's performance of the same IDQ contract. Using these documents, Schweiger generated a comparison between the actual quantities ordered and the estimates. Schweiger contends that this comparison shows the GSA did not make an effort to use the most recent and accurate figures available to prepare the solicitation for the contract it was ultimately awarded. Schweiger further avers that this finding is buttressed by GSA contracting officer Peggy Jewitt's statement that the GSA relied on estimated budgets rather than statistical information based on past performance in computing the "minimum and maximum" dollar amounts. According to Schweiger, Ms. Jewitt also stated that GSA has since modified the current solicitation to reflect accurate after-hours requirements and has removed the estimated quantities next to the line items.

In its complaint, Schweiger seeks relief on six counts: (1) breach of contract; (2) breach of express warranty; (3) breach of implied warranty; (4) fraudulent misrepresentation; (5) declaratory judgment against GSA; and (6) declaratory judgment against GAO. The defendant filed its answer on February 5, 1999. On May 6, 1999, the defendant moved to dismiss Counts I–III pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims (RCFC) and Counts IV–VI pursuant to RCFC 12(b)(4). On July 19, 1999 the plaintiff filed its opposition to defendant's motion to dismiss. In turn, the government filed its reply on October 5, 1999.

In its opposition to the government's motion to dismiss, plaintiff sought to dismiss part of Count V without prejudice. On July 19, 2000, plaintiff filed a separate document captioned "Plaintiff's Stipulation of Partial Dismissal," wherein it seeks to dismiss Count VI of its complaint without prejudice.

On May 30, 2000, Schweiger filed its motion to lift stay of discovery that has been in place since May 5, 1999. On June 12, 2000, the government filed its opposition to this motion.

## DISCUSSION

### I. Motion to Dismiss for Failure to State a Claim—RCFC 12(b)(4)

The government argues that this court should dismiss counts I–III of Schweiger's claim because, pursuant to RCFC 12(b)(4) Schweiger has failed to state a claim upon which relief can be granted. RCFC 12(b)(4) is identical to Rule 12(b)(6) of the Federal Rules of Civil Procedure, which provides that a claim will be dismissed when it fails "to state a claim upon which relief can be granted." RCFC 12(b)(4); Fed.R.Civ.P. 12(b)(6). These rules "allow the dismissal of actions that are 'fatally flawed in their legal premises and destined to fail, * * * spar[ing] litigants the burdens of unnecessary pretrial and trial activity.'" *Maniere v. United States*, 31 Fed.Cl. 410, 419 (1994) (quoting *Advanced Cardiovascular Sys. Inc. v. SciMed Life Sys., Inc.*, 988 F.2d 1157, 1160 (Fed.Cir. 1993)). In order to withstand a 12(b)(4) mo-

tion to dismiss, the plaintiff must allege facts that would, if they were ultimately established, permit relief as a matter of law. *Maniere*, 31 Fed.Cl. at 421 (citing *Howard v. United States*, 21 Cl.Ct. 475, 477 (1990)). See also *Conley v. Gibson*, 355 U.S. 41, 45, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). In ruling on a motion to dismiss, this court must construe all allegations in the light most favorable to the nonmoving party. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). A ruling under RCFC 12(b)(4) is an adjudication on the merits. *L.E. Cooke Corp. v. United States*, 27 Fed.Cl. 753, 755 (1993).

Schweiger's primary contentions in support of its claims of breach of contract and breach of express and implied warranty are: (1) the government's quantity estimates were grossly inaccurate; (2) Schweiger was required pursuant to the terms of the solicitation to rely upon the government's estimates in computing its bid; and (3) the government included this large-scale project within the scope of the IDQ contract without notifying plaintiff of its intentions to do so. The focus of the government's argument in its motion to dismiss for failure to state a claim upon which relief could be granted is that its only obligation in this case was to "order the guaranteed minimum of services-nothing more," here $175,802.15 of services. Motion to Dismiss at 12. It further avers that inaccurate or negligently prepared estimates for IDQ contracts cannot provide a basis for a breach of contract claim. Thus, the first issue this court needs to resolve in ruling on the government's motion to dismiss is whether the plaintiff's allegations of inaccurate estimates state a claim upon which relief can be granted.

### A. Whether Schweiger's allegations of inaccurate estimates state a claim upon which relief can be granted

#### 1. Whether the government's obligation to order the contractual minimum precludes Schweiger from recovering for inaccurate estimates

■ The government argues that pursuant to the contract its "obligation [was] limited to

ordering the guaranteed minimum." Motion to Dismiss at 12. In support, it asserts that the contract expresses the "limited nature" of the government's obligation in a multitude of ways. First, the contract states:

This is an indefinite quantity contract for the supplies and services specified, and effective for the period stated in the Schedule. The quantities of supplies and services specified in the Schedule are estimates only and are not purchased by this contract.

Motion to Dismiss at 12 (quoting Compl. Exhibit 27, p. 00800–5).

The government also contends that the following provision supports its argument that a plaintiff cannot maintain a cause of action based on the government's failure to order estimated dollar amounts or quantities:

The contractor shall perform work included in approved Delivery Orders at or above the minimum order which does not exceed the maximum limit. If the requirements for services set forth in the solicitation do not result in orders in dollar amounts or quantities described in the solicitation as estimated or maximum, this event shall not constitute the basis for a price adjustment under this contract.

*Id.* at 12 (quoting Compl. Exhibit 9 at 01010–3).

In further support of its contention that the government's only obligation is to order the guaranteed minimum, defendant offers the following contractual provision:

The Contractor shall furnish to the government when and if ordered, the supplies or services specified in the Schedule up to and including the quantity designated in the Schedule as the "maximum." The government shall order at least the quantity of supplies or services designated in the Schedule as "minimum."

*Id.* at 12 (quoting Compl. Exhibit 27, p. 00800–5 (emphasis added)); 48 C.F.R. § 52.216–22 (1984).

The government also states that the following contractual provision illustrates that its obligations were limited:

The government reserves the right to undertake by government employees or oth-

ers that same type of similar work as contracted herein, and to do so shall not be in violation of the terms of this contract nor construed as a termination in part or in total for the convenience of the government.

*Id.* at 13 (quoting Compl. Exhibit 9 at 01010–4).

It is true that in an indefinite-quantity contract, the government is obligated to order the stated minimum quantity. 48 C.F.R. § 16.504(a)(2). *See also Willard, Sutherland & Co. v. United States,* 262 U.S. 489, 492, 43 S.Ct. 592, 593, 67 L.Ed. 1086 (1923) (holding that a contract without a minimum quantity term is unenforceable for "lack of consideration and mutuality"). As the court in *Mason v. United States,* 222 Ct.Cl. 436, 615 F.2d 1343, n. 5 (1980) explained:

An indefinite quantities contract is a contract under which the buyer agrees to purchase and the seller agrees to supply whatever quantity of goods the buyer chooses to purchase from the seller. It differs from a requirements contract in that under a requirements contract the buyer agrees to purchase all his requirements from the seller. Under an indefinite quantities contract, even if the buyer has requirements, he is not obligated to purchase from the seller. In an indefinite quantities contract, without more, the buyer's promise is illusory and the contract unenforceable against the seller. *Willard, Sutherland & Co. v. United States,* 262 U.S. 489, 493, 43 S.Ct. 592, 594, 67 L.Ed. 1086 (1923); 1A Corbin, Contracts s 157 (1963 & Supp.1971). To make such contract enforceable, the buyer must agree to purchase from the seller at least a guaranteed minimum quantity of goods or services. If the contract contains such a minimum quantity clause, the buyer is required to purchase at least this minimum amount, but this is the extent of his legal obligation. He can purchase more if he chooses to but is under no obligation to do so.

In this case it is uncontested that the government did indeed order substantially more than the contractual minimum. According to Schweiger's complaint, the government issued three delivery orders under

the contract reflecting final values of $298,239.18; $264,270.20; and $282,989.59, respectively. Thus, the total delivery orders amount to $845,498. The contractual minimum guaranteed was $175,802.15. Accordingly, the government's order exceeded the contractual minimum by over four times.

Despite the government's strong emphasis on the fact that in an indefinite-quantity contract the government is obligated only to order the stated minimum quantity, a point with which this court agrees, this conclusion does not necessarily function to preclude Schweiger from recovery, as the government contends. A key inquiry here is actually whether the accuracy of estimates is a legitimate inquiry for this court to undertake. In its analysis, the government merges two distinct inquiries into one, and contends that:

the Court does not evaluate the accuracy of estimates set forth in an indefinite quantity contract ... [a]s a matter of law, a plaintiff is precluded from recovery based upon such estimates. The government meets its obligation pursuant to an indefinite quantity contract when it has ordered at least the contract guaranteed minimum.

Motion to Dismiss at 18. An examination of the three cases the government relies upon in support of this argument shows that they *do not* stand for the following proposition: Because the government only has an obligation to order the contractual minimum in an IDQ contract, it follows that the plaintiff is precluded from recovering for inaccurate estimates.

The government contends that *Rice Lake Contracting, Inc. v. United States*, 33 Fed.Cl. 144 (1995), stands for the proposition that the government's only obligation under an IDQ contract was to order the stated minimum quantity, and as such, plaintiff was precluded as a matter of law from recovering for negligent or inaccurately prepared estimates. In *Rice Lake*, plaintiff entered into a contract to maintain the hardwood floors and painting at a military base. *Id.* at 146. The crux of the plaintiff's argument was that it entered into a requirements contract that the government had breached by failing to order "the full complement of services under the contract." *Id.* at 146. The government had, however,

ordered more than eleven times the contractual minimum of $5,000. *Id.* at 148. The court rejected the plaintiff's argument, finding that because the contract was an indefinite-quantity contract and not a requirements contract, "the legal obligation of the government was only to satisfy the stated minimum in the contract." *Id.* at 154.

Although it is true that in *Rice Lake* the court ruled that the government did not have an obligation to order the estimated quantities and that the government had met its obligation by ordering the minimum dollar amount, in the case at bar the government pulls the statement "the legal obligation of the government was only to satisfy the stated minimum in the contract" out of context. In *Rice Lake*, the court made this statement in the context of finding that the government did not have to order all of its requirements from the plaintiff because the contract at issue was one for an indefinite-quantity and was not a requirements contract. The court was merely explaining the difference in obligations between a requirements contract and one for an indefinite-quantity. Given this context, the quotation the government relies upon does not mean, as it contends, that the plaintiff is precluded as a matter of law from recovering for inaccurate estimates under any and all circumstances. Stated another way, the question of the government's obligation to order the stated minimum quantity (a fact that is undisputed in this case) is entirely distinguishable from whether a plaintiff may maintain a cause of action for inaccurately prepared estimates.

The government's reliance on *Mason v. United States*, 222 Ct.Cl. 436, 615 F.2d 1343 (1980) suffers from similar defects. It argues that this case also stands for the proposition that the government's only contractual obligation was to order the designated minimum, and that inaccurate estimates cannot provide a basis for a contract breach. Motion to Dismiss at 11. In *Mason*, the plaintiff entered into a contract with the government to provide construction services within a fixed geographical area. *Id.* at 1344. The government awarded some of this work to other contractors. *Id.* at 1345. The contractor claimed that it had the exclusive contrac-

tual right to perform all required construction work in a given locality. *Id.* The court determined the plaintiff's contract was an indefinite-quantity contract. *Id.* at 1350. As such, found the court, the government did not breach its contractual obligation by awarding work to other contractors because it had satisfied its obligation under the indefinite-quantity contract to order $5,000 worth of work. *Id.*

*Mason* involved an allegation that all of the requirements should have been ordered from one contractor. It did not involve any allegation of the government's failure to provide accurate estimates, and is largely inapposite. As such, the government's assertion that its only obligation under an IDQ contract is to order the contractual minimum and thus, the plaintiff is precluded from recovering for inaccurate estimates finds no support whatsoever in *Mason.*

Likewise, the government's reliance on *Coastal States Petrochemical Company v. United States,* 214 Ct.Cl. 520, 559 F.2d 1 (1977) is similarly misplaced. The plaintiff in *Coastal States* was one of several contractors who, during the Vietnam War era, contracted to provide the government with jet fuel. *Id.* at 4. Soon thereafter, however, the government reduced its operations in Vietnam and, accordingly, its needs for jet fuel were drastically cut. *Id.* The contractor's principal argument was that the contract was a requirements contract, rather than an indefinite-quantity contract and, as such, the government had breached its contractual obligations by failing to order all of its jet fuel from the plaintiff. The court found that the contract at issue was actually an IDQ contract, and, as such, the only obligation it owed to plaintiff was to satisfy a minimum purchase requirement. *Id.* at 1; 9. In *Schweiger,* the government lifts this statement out of context and states that it stands for the proposition that "[i]t is also well established that the Court does not evaluate the accuracy of estimates set forth in an indefinite-quantity contract, and such estimates cannot form the basis for an alleged breach." Motion to Dismiss at 11. Analytically, it does not follow from the fact the government only has an obligation to order the minimum that the

courts will not review estimates. This court finds no support in the case law for the government's analytical leap and, accordingly, refuses to take it.

Thus, having concluded that it does not follow from the fact the government has an obligation to order the contractual minimum in an indefinite-quantity contract that courts may never review the accuracy of estimates in IDQ contracts, it is necessary to discern the following: (1) whether this court may review the accuracy of estimates in IDQ contracts; and (2) if this court may review the estimates, what standard it will employ. The government fuses these two inquiries into one in its motion to dismiss and fails to analyze them as two distinct issues. The government's primary contention in its motion to dismiss is that "it is well established that the Court will not evaluate the estimates in an indefinite quantity contract ... [a]s a matter of law, a plaintiff is precluded from recovery based upon such estimates." Motion to Dismiss at 18. In fact, however, the case law shows that the courts will examine the accuracy of estimates in IDQ contracts in the event the government's actions went beyond mere negligence.

## 2. Whether courts may review the accuracy of estimates in IDQ contracts

The government contends that courts will not examine estimates in indefinite-quantity contracts. This threshold postulate requires examination.

In support of its contention that courts will not examine estimates in indefinite-quantity contracts, the government relies upon *Appeal of Crown Laundry & Dry Cleaners, Inc.,* 90–3 BCA ¶ 22,993, ASBCA No. 39982, 1990 WL 133171 (May 21, 1990), *aff'd,* 935 F.2d 281 (1991) (Table). In *Crown Laundry,* after concluding that the contract at issue was an indefinite-quantity contract rather than a requirements contract, the board of contract appeals went on to decide whether the contractor could recover for the government's allegedly negligently prepared estimates upon which the contractor based its bid. *Id.* at 115,481. The contractor alleged that the government's failure to use due care in pre-

paring its estimates resulted in damages to the contractor when the government's work orders did not approach the contractual maximum. *Id.* The board held, however, that "[t]o the extent that appellant relied on the government's estimates and assumed that the government would order the maximum, its reliance and assumption were both misplaced." *Id.* Moreover, the board stated that it does "not examine the reasonableness of the estimates in indefinite quantity contracts."

This blanket statement that the reasonableness of estimates in indefinite-quantity contracts will not be examined must, however, be tempered by the great weight of other authority which demonstrates that courts *will* evaluate the accuracy of estimates in the face of more egregious conduct by the government, rising to the level of "bad faith." As discussed below, although it is true that courts will not examine the reasonableness of such estimates in the face of allegations of negligence, in the IDQ contract context courts will examine the estimates in instances of more egregious governmental conduct.

There is a sharp distinction between the analysis for requirements contracts and that for indefinite-quantity contracts. Courts will evaluate claims of negligent estimates in the requirements contracts context, but not in the IDQ contracts context. The leading case in this area is *Dot Systems, Inc. v. United States*, 231 Ct.Cl. 765, 1982 WL 25218 (1982). In that case, the plaintiff argued it was entitled to an equitable adjustment based on the government's failure to order more than ten percent of the estimates. *Id.* at 766, 768. The court framed the issue as "whether as a matter of law plaintiff is precluded from recovering for errors in defendant's estimates in an indefinite quantity contract." *Id.* at 768. The court found that the key inquiry concerned the allocation of risk under the contract, and stated: "The general rule is clear: a contractor cannot sign a contract which allocates the risk to it and then 4 years later come to this court, having lost its gamble, and insist that the risk be placed on the government." *Id.* The court focused on the fact that the solicitation expressly stated that the estimates were estimates and not guaran-

tees. *Id.* at 769. Based on this fact, the court found that the plaintiff could not reasonably have believed the full amount of the estimates were to be ordered. *Id.* It noted that a contractor in an indefinite-quantity contract "cannot expect the kind of accuracy in estimation that it can in a requirements or fixed price contract ... [and] the government cannot be held to the negligence standard for requirements contracts enunciated in *Womack v. United States*, 182 Ct.Cl. 399, 412–13, 389 F.2d 793, 801 (1968)." *Id.* In *Dot Systems*, the estimates had been calculated by examining historical data, and the court found this method of computation in accord with the regulatory requirements. *Id.* at 769–70. The court did not explicitly state what standard it was applying to adjudge the accuracy of the estimates. It is clear the court was not applying a negligence standard, but it is unclear whether the standard it invoked was one of gross negligence or bad faith. *Id.* Based on these findings, the court granted the government's motion for summary judgment. *Id.* at 770.

The overwhelming majority of courts have embraced the view of *Womack* and *Dot Systems* that requirements contracts and contracts for an indefinite-quantity impose entirely different standards of care on the government, and, as such, it will be much harder for a contractor who is a party to an indefinite-quantity contract to recover for inaccurate estimates. *See e.g. Deterline Corp.*, 88–3 BCA ¶ 21,132, ASBCA No. 33090, 1988 WL 97141 (Aug. 4, 1988). For example, in *C.F.S. Air Cargo, Inc.*, 91–2 BCA ¶ 23, 985, ASBCA No. 40694, 1991 WL 81616 (April 30, 1991), the contractor brought suit seeking an equitable adjustment for the government's failure to order less than the estimated quantities under an indefinite-quantity, indefinite delivery contract. *Id.* at 120,036. The plaintiff argued (1) the estimates were negligently prepared; (2) the government violated the requirement of FAR § 16.504(a)(1) that the estimated and maximum quantities " 'should be realistic and based on the most recent information available;' " (3) the government is estopped from denying the accuracy of its estimates; and (4) mutual or unilateral mistake. *Id.* at 120,038. In *C.F.S.*, the con-

tractor relied primarily on *Womack*. *Id.* Significantly, however, the contract at issue in *Womack* was a requirements contract and not an IDQ contract. The Armed Services Board of Contract Appeals (ASBCA) cited *Crown Laundry*, 90–3 BCA ¶ 22,993, for the proposition that under an IDQ contract, the government is "only obligated to order the minimum quantity stated." *Id.* The Board found public policy and essential fairness do not require that the government be held accountable for its negligent preparation of estimates if the contract is an IDQ because "whether the estimates were negligently prepared or not is simply not material in light of the government's legal obligation to order only the guaranteed minimum." *Id.* at 120,040. In *C.F.S.*, the board also found that the contractor had assumed the risk of the contract because the IDQ clause warned offerors that the quantities specified were estimates only and not purchased by the contract. Thus, the ASBCA denied recovery, but, significantly, it emphasized that there had been no allegation of bad faith in this case. *Id.*

■ It follows from the foregoing discussion that the case law clearly draws a distinction between recovery for estimates in a requirements contract context versus in an IDQ contract context. Courts will review the accuracy of estimates amid allegations of negligent preparation of estimates in the requirements contract context. By contrast, courts will not review the accuracy of estimates in indefinite-quantity contracts where mere negligence has been alleged. They will, however, permit recovery for inaccurate estimates in the event of more egregious governmental conduct, most usually defined as "bad faith." Accordingly, the government's blanket statement that the Court does not evaluate estimates in indefinite-quantity contracts is incorrect. And although Schweiger is correct in stating that the courts considered granting recovery for the government's negligently prepared estimates in *Medart, Inc. v. Austin*, 967 F.2d 579 (Fed. Cir.1992), and *Crown Laundry & Dry Cleaners, Inc. v. United States*, 29 Fed.Cl. 506 (1993) these cases do nothing to advance plaintiff's position as they involve requirements contracts rather than contracts for an

indefinite-quantity. The question then, that this court needs to resolve is what conduct is egregious enough to constitute breach of an indefinite-quantity contract. This question is the subject of the next heading.

### 3. What type of conduct is sufficient to sustain a finding of breach for the government's failure to supply accurate estimates

As a preliminary point, there is an overall dearth of case law in this area, and there appear to be no cases with facts similar to those in the present dispute. In the majority of the cases involving indefinite-quantity contracts, there were only allegations of negligent preparation of estimates and, as such, both boards and the courts denied recovery. *See Crown Laundry*, 90–3 BCA ¶ 22,993 at 115,481; *Deterline*, 88–3 BCA ¶ 21,132 at 106,689; *C.F.S. Air Cargo*, 91–2 BCA ¶ 23,-985 at 120,040; *Dot Systems*, 231 Ct.Cl. at 769–70; *Appeal of DynCorp*, 91–2 BCA ¶ 24,-044, ASBCA No. 38862, 1991 WL 100545 (May 7, 1991). After reviewing the cases in the preceding section, however, it is clear that the government will be held to a less stringent standard of accuracy for estimates in indefinite-quantity contracts than in requirements contracts. It is, however, not nearly so clear what the current legal standard is for indefinite-quantity contracts. *See Estimates in Indefinite Quantity/Indefinite Delivery Contracts*, THE NASH & CIBINIC REPORT, Dec. 1999, ¶ 63 at 183–85. Thus, it is necessary to turn to the cases that have dealt with this issue.

*Dot Systems*, discussed *supra*, is the Court of Claims case which enunciated that the standard applicable to governmental estimates in requirements contracts differs from that applicable in contracts for an indefinite-quantity contract. The court stated:

> The present contract is not a requirements contract; it is an indefinite quantity contract. This distinction is crucial to an understanding of the parties' legitimate expectations and their responsibilities. The contractor here cannot expect the kind of accuracy in estimation that it can in a requirements or fixed price contract. By

the same token, the government cannot be held to the negligence standard for requirements contracts, enunciated in *Womack v. United States*, 182 Ct.Cl. 399, 412–13, 389 F.2d 793, 801 (1968).

*Dot Systems*, 231 Ct.Cl. at 769. Thus, although the court did make it clear that the government would be held to a higher standard in preparing estimates for requirements contracts than it would for indefinite-quantity contracts, it did not explicitly specify the applicable standard. Although, as discussed below, several cases have stated that to recover for inaccurate estimates in indefinite-quantity contracts a contractor would have to show bad faith, such a standard is not firmly moored in *Dot Systems. See C.F.S. Air Cargo Inc.*, 91–2 BCA 23,985, ASBCA No. 40694, 1991 WL 81616 (April 30, 1991). The *Dot Systems* court could have intended to invoke a standard, such as gross negligence, that does not rise to the level of bad faith.

There appear to be no Court of Federal Claims cases that explicitly define the standard for assessing the government's liability for the accuracy of indefinite-quantity contract estimates. Generally, the boards of contract appeals have required contractors to make a showing of bad faith before permitting recovery for inaccurate estimates. In most cases, courts have imposed a very high standard on contractors to establish bad faith on the part of the government. Courts have embraced the rule that there is a presumption the government acts in good faith which cannot easily be rebutted. They derive this view from *Kalvar Corp. v. United States*, 211 Ct.Cl. 192, 543 F.2d 1298, 1301–02 (1976), *cert. denied*, 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977), and its progeny, which hold that to overcome this presumption contractors must submit "well-nigh irrefragable proof" of bad faith. *Kalvar Corp.*, 543 F.2d at 1302.

Illustrative of the approach requiring "well-nigh irrefragable proof" of bad faith is *Tracor Technology Resources, Inc.*, 93–2 BCA ¶ 25,616, ASBCA No. 44759, 1992 WL 355809 (Nov. 30, 1992), wherein the plaintiff sued for breach of contract because the government ordered fewer samples than the estimated quantity. The contractor alleged "bad faith" on the part of the government. *Id.* at 127,515. The board found that the contractor had not provided enough evidence of bad faith to survive the government's motion for summary judgment. It stated: "'Bare unsupported allegations of the kind appellant have made in this case do not raise a material factual issue sufficient to defeat a motion for summary judgment.'" *Id.* (quoting *Appeal of Arnold Hedberg*, 90–1 BCA ¶ 22,577, ASBCA No. 31747, 1989 WL 161146 (Nov. 31, 1989)). The board found that the contractor's allegations of bad faith provided no evidence to support its contention that the estimates were wild guesses. It was careful to note that allegations are not evidence, and that "'well-nigh irrefragable proof'" is necessary to rebut the presumption of good faith dealing. *Id.* (quoting *Kalvar Corp. v. United States*, 211 Ct.Cl. 192, 543 F.2d 1298 (1976)).

*DynCorp*, 91–2 BCA ¶ 24,044, ASBCA No. 38862, 1991 WL 100545 (May 7, 1991), *aff'd*, 972 F.2d 1353 (Fed.Cir.1992) (Table), is another case imposing a similarly high standard to establish bad faith. In this case, the ASBCA denied the contractor's claims that it should be entitled to recover for the government's inaccurate estimates. In ruling on the government's motion for summary judgment, the board considered the adequacy of plaintiff's pleading of bad faith. *Id.* at 120,-350. It stated that, in denying the plaintiff's claims, it had "'taken into consideration counsel's suggestions that while DynCorp has not specifically alleged 'bad faith conduct by the government in preparing the estimates, such conduct certainly falls within DynCorp's allegation that the estimates were not realistic or based on the most current information available.'" *Id.* (quoting Motion in Opposition at 10). The board stated that allegations of bad faith would not be taken lightly as they are serious and go beyond allegations of negligence: "An allegation of this nature is not to be derived from a general allegation that the estimates were not realistic or based on the most current information available." The ASBCA found that bad faith had not been specifically alleged and that the board would not imply it. *Id.* (citing *Appeal of Arnold Hedberg*, 90–1 BCA ¶ 22,577, ASBCA No. 31747, 1989 WL 161146 (Nov. 30, 1989)).

The rationale underlying *Tracor Technology, DynCorp,* and other decisions imposing very high standards to establish allegations of bad faith is that the boards of contract appeals are unwilling to shift the risk of the IDQ contract to the government. *See DynCorp,* 91–2 BCA ¶ 24,044 at 120,350, ASBCA No. 38862, 1991 WL 100545 (May 7, 1991) (citing *C.F.S. Air Cargo, Inc.,* 91–2 BCA ¶ 23,985, ASBCA No. 40694, 1991 WL 81616 (April 30, 1991), *aff'd,* 944 F.2d 913 (Fed.Cir. 1992) (Table)). The idea is that the contractor accepts the risk that the maximum quantity and the estimates will not be attained. *Id. See also Deterline Corp.,* 88–3 BCA 21,132, ASBCA No. 33090, 1988 WL 97141 (Aug. 4, 1988) (denying a contractor's claim for recovery based on negligent estimates in an IDQ contract on the grounds that the contractor bore the risk orders might be limited to the minimum amount).

The General Services Administration Board of Contract Appeals (GSBCA), however, declined in *Travel Centre v. General Services Administration,* 98–1 BCA ¶ 29,536, GSBCA No. 14057, 1997 WL 745049 (Nov. 26, 1997), *reconsid. denied,* 98–1 BCA ¶ 29,541, 1998 WL 29972 (Jan. 23, 1998), to have the contractor shoulder the risk of the indefinite quantity contract it entered. In *Travel Centre,* the board departed from the line of decisions imposing very high standards to establish bad faith, and instead applied a relatively broad standard of bad faith. Schweiger relies heavily on the decision on damages, *Travel Centre v. General Services Administration,* 99–2 BCA ¶ 30,521, GSBCA No. 14057, 1999 WL 636168 (Aug. 18, 1999), *reconsid. denied,* 1999 WL 771052, GSBCA No. 14,057–R (Sept. 28, 1999), stating that this case "patently and unequivocally" establishes that plaintiff's complaint states a cause of action. Plaintiff's Motion for Leave to File Supplemental Authority in Opposition to Defendant's Motion to Dismiss at 1.

In view of the extensive briefing of *Travel Centre,* and the fact that it is currently on appeal before the Federal Circuit, the case warrants a more in depth examination. In *Travel Centre,* the plaintiff entered into an IDQ type contract in which it was to provide travel services to government agencies in a specified geographic area. During the time the government was evaluating bids, it learned that because of another award, less than half of the estimated services would be needed. The GSA never informed offerors of this information, and accordingly, when anticipated business failed to materialize, Travel Centre, the contractor, suffered financial and performance problems. GSA subsequently terminated the contract for default. Travel Centre appealed, arguing that by inducing Travel Centre to enter the contract with full knowledge that the estimates greatly overstated the anticipated business, the government exhibited the "bad faith" necessary to sustain a finding of breach of contract. The board found for Travel Centre, determining that the GSA withheld crucial information material to a potential offeror's decision of whether to submit an offer at all. Accordingly, the ASBCA held that GSA exhibited the requisite "bad faith" to sustain a finding of breach of contract. In its opinion, the majority characterizes the dissent's opinion as standing for the following proposition regarding indefinite-quantity contracts: "Anyone who is dumb enough to rely on the government's promises deserves what he gets." *Id.* at 150,714. The GSBCA stated it refused to adopt this view, because "[t]here is no type of contract; including one for an indefinite quantity, in which the contractor assumes the risk that the government has intentionally misled it." *Id.*

In an important dissent, Administrative Judge Hyatt adopted a much different view of the events leading up to the lawsuit. In her opinion, the government's failure to update the estimates constituted, at most, negligent conduct. *Id.* at 150,720. She explained that in an IDQ contract, governmental negligence is insufficient to warrant recovery. *Id.* The dissent noted that the estimates themselves were internally inconsistent and that Travel Centre had apparently chosen to rely on the higher estimates. *Id.* at 150,721. In analyzing the contractor's claims, Judge Hyatt found it critical that there is no proof that GSA had any deliberate intent to harm Travel Centre through nondisclosure of information. *Id.* at 150,728. The dissent stated that precedent only provides for recovery in the case of bad faith for faulty estimates in

the IDQ contracts context. *Id.* at 150,728. The dissent interpreted bad faith to mean "more than sloppy contract administration." *Id.* She stated that most courts have found it " 'requires showing some specific intent to injure the contractor or a showing of malice or conspiracy.' " *Id.* (quoting *Lopez Machine Works, Inc.,* 97–1 BCA ¶ 28,622, at 142,910, ASBCA No. 45509, 1996 WL 616409 (Oct. 18, 1996)). Judge Hyatt concluded that the plaintiff in *Travel Centre* had not met this requisite showing. She stated that an allegation of bad faith " 'is not to be derived from a general allegation that the estimates were not realistic or based upon the most current information available.' " *Id.* (quoting *DynCorp,* 91–2 BCA 24,044 at 20,350, ASBCA No. 38,862, 1991 WL 100545 (May 7, 1991), *aff'd,* 972 F.2d 1353 (Fed.Cir.1992) (Table)). In her examination of the facts of the case, Judge Hyatt found that although the failure to disclose the competing award may have been an unfortunate oversight, it did not constitute bad faith, as there was no specific intent. *Id.* at 150,729. Thus, absent bad faith, the contractor was precluded from recovery. *Id.*

The dissent explained the rationale underlying the different standards for IDQ contracts and requirements contracts as follows: It reasoned that the distinguishing characteristic of an IDQ contract is that the precise amount of orders that will be generated pursuant to the contract is an unknown quantity falling somewhere between the minimum and maximum amounts, whereas in a requirements contract the only definitive information given by the government is that all business generated will be awarded exclusively to the contractor. *Id.* at 150,725. As such, the contractor in the requirements contract context may recover if the government has been negligent in preparing or updating its estimates because it must base its bid on the probable amount of ensuing business. *Id.* By contrast, under an IDQ contract, the government's only obligation is to order the minimum. *Id.* Because the government is always free to order any amount beyond the contractual minimum from another source, the contractor cannot reasonably assume the government will order any amount beyond the minimum. *Id.* Thus, the contractor assumes a greater risk when it enters into an IDQ contract because there is greater risk inherent in the structure of the contract itself. *Id.* For this reason, a contractor can only recover for negligent estimates in the context of a requirements contract. *Id.* at 150,726. Under an IDQ contract, the contractor can only recover if the government breaches its promise to order the guaranteed minimum.[3] *Id.* This remains true even in a case where the government did not exercise due care in preparing its estimates. *Id.* (citing *Dot Systems, Inc. v. United States,* 231 Ct.Cl. 765, 1982 WL 25218 (1982); *DynCorp,* 91–2 BCA ¶ 24,044, ASBCA No. 38862, 1991 WL 100545 (May 7, 1991), *aff'd,* 972 F.2d 1353 (Fed.Cir.1992) (Table); *C.F.S. Cargo, Inc.,* 91–2 BCA ¶ 23,985, ASBCA No. 40694, 1991 WL 81616 (April 30, 1991); *Crown Laundry & Dry Cleaners,* 90–3 BCA ¶ 22,-993, ASBCA No. 39982, 1990 WL 133171 (May 21, 1990), *aff'd,* 935 F.2d 281 (Fed.Cir. 1991) (Table)).

*Travel Centre* is currently on appeal to the United States Court of Appeals for the Federal Circuit. The case was submitted on the briefs on November 8, 2000. On the issue of whether the inadequacy of the estimates constitutes a breach, the government argues that it does not because there is "simply no evidence that GSA acted with intent to harm Travel Centre … in failing to follow-up and correct its estimates." Brief of Cross–Appellant at 21, *Travel Centre v. GSA* (No. 00–1054, –1126). This case will, hopefully, function to illuminate this murky area of the law, given that *Dot Systems* does not delineate the different standards; the boards of contract appeals have applied different standards; and there is currently no precedential Federal Circuit opinion specifically concern-

---

**3.** The court notes that while this legal principle, as set forth by the dissent, is generally correct and well-founded, there may be circumstances *other* than a failure to order the guaranteed minimum in which the government might be liable for damages or breach of an IDQ contract (e.g., constructive changes or a cardinal change to the contract). There is no intention by this court to imply that the only circumstances under which the government could breach an IDQ contract would be if the government failed to order the guaranteed minimum.

ing the issue of inaccurate estimates in indefinite-quantity contracts.

This court finds reliance on *Travel Centre* problematic for several reasons and, absent a decision from the Federal Circuit requiring the contrary, declines to follow it. First, as the government points out, *Travel Centre* is of limited precedential value even before the GSBCA. The fact that Judge Hyatt joined the majority opinion in the original case and then dissented during the damages phase demonstrates the complexity and unsettledness inherent in this area of the law. In the view of this court, Judge Hyatt's dissent successfully grapples with the existing case law in this area while, by contrast, the August 18, 1999 board opinion fails to cite precedent in reaching its conclusion that the government breached its contractual obligations by failing to provide inaccurate estimates.

In addition, this court finds the "standard" invoked by the *Travel Centre* contract appeals board problematic. First, it is unclear what standard the board actually intends to invoke. Although the board proceeds under the auspices of a "bad faith" analysis, in fact it seems that the GSBCA is not applying a true bad faith analysis.[4] The board states that even if the GSA "recklessly disregard[ed]" the important additional information of which it failed to inform the contractor, the contractor still had established the requisite bad faith element. *Travel Centre,* 98–1 BCA ¶ 29,536 at 146,431, GSBCA No. 14057, 1997 WL 745049 (Nov. 26, 1997). There is myriad case law in this court and the Federal Circuit to establish that "it requires 'well-nigh irrefragable proof' to induce the court to abandon the presumption of good faith dealing" traditionally accorded to the government. *Torncello v. United States,* 231 Ct.Cl. 20, 681 F.2d 756, 770 (1982). To establish "irrefragable proof" the plaintiff must show evidence of "some specific intent to injure the plaintiff." *Id. See also LaMear v. United States,* 9 Cl.Ct. 562, 570, *aff'd,* 809

F.2d 789 (Fed.Cir.1986) (Table), (citing *Wood v. Carpenter,* 101 U.S. (11 Otto) 135, 143, 25 L.Ed. 807 (1879)). The type of government actions that have been deemed to rise to the level of this specific intent include those "'motivated alone by malice;'" *Gadsden v. United States,* 78 F.Supp. 126, 127, 111 Ct.Cl. 487, 489–90 (1948); "'actuated by animus toward the plaintiff;'" *Kalvar Corp. v. United States* at 198–99; and those the government enters "with no intention of fulfilling its promises." *Krygoski Construction Co. v. United States,* 94 F.3d 1537, 1545 (Fed.Cir. 1996).

The standard of reckless disregard referred to by the GSBCA in *Travel Centre* is akin to gross negligence. That standard is, in this court's view, closer to the negligence standard under which contractors may obtain recovery for inaccurate estimates in *requirements* contracts. As discussed at length in Judge Hyatt's dissenting opinion in *Travel Centre* the standard differs for these two types of contracts because in the requirements contract context the contractor's reliance upon the estimates is more substantial than in an IDQ contract context. *See supra.*

Accordingly, insofar as *Travel Centre* invokes a less stringent standard for establishing bad faith than that heretofore employed by this court and the Federal Circuit, this court declines to follow it.

### 4. Whether Schweiger has stated a claim to recover for the government's inaccurate estimates

This court must deny the government's motion to dismiss "'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Maniere v. United States,* 31 Fed.Cl. 410, 419 (1994) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)). In order to survive a motion to dismiss pursuant to RCFC 12(b)(4) a plaintiff must present facts

---

4. Commentators have opined that the board's opinion in *Travel Centre* is not representative of the analysis applicable to a true IDQ contract because the majority emphasized that the contract referred to the contractor as the "preferred source" for travel services within the specified

geographic region. This provision may have led the contractor to reasonable reliance on the estimate, and, as such, it might be argued that the contract appeals board considered the contract to be more like a requirements contract than an indefinite-quantity contract.

that, if proven, would state a claim upon which relief could be granted. *Id.* (citing *Howard v. United States,* 21 Cl.Ct. 475, 477 (1990)). In ruling on the government's motion to dismiss, this court must assume the plaintiff's well-pled factual assertions are true and draw all reasonable inferences in plaintiff's favor. *New Valley Corp. v. United States,* 119 F.3d 1576, 1580 (Fed.Cir.1997).

■ As discussed *supra,* this court has concluded that Schweiger must present "well-nigh irrefragable" proof that the government acted in bad faith to recover for inaccurate estimates. The court notes, however, that it will of course be bound by the Federal Circuit's opinion in *Travel Centre* and that court could find that the contractor's burden is lower. Absent a change in the law occasioned by the *Travel Centre* case, it is indeed extremely difficult for a plaintiff to establish that the government has acted in bad faith, insofar as the standard is extremely high. Nonetheless, this court must deny the defendant's motion to dismiss on Count I–Breach of Contract, Count II–Breach of Express Warranty, and Count III–Breach of Implied Warranty. The plaintiff is entitled to the opportunity to further present the facts it alleges to substantiate its claims of bad faith. At this juncture, the court cannot make a determination as to the sufficiency of the plaintiff's allegations given the information the parties have presented, and "a motion to dismiss, pursuant to RCFC 12(b)(4), requires that the court reach its decision based on the evidence presented by the parties." *Hannon v. United States,* 29 Fed.Cl. 142, 149 (1993).

■ Plaintiff does make allegations that present a bare foundation for a claim of bad faith. That is, there may be a set of facts that the plaintiff could present to establish bad faith. Although plaintiff does not specifically employ the term of art "bad faith," its complaint contains allegations suggestive of bad faith. For example, Schweiger states in its complaint:

The G.S.A. thus issued solicitation specifications which were knowingly and intentionally false, non-representative of the actual requirements, or in the alternative, issued with a reckless disregard of their truth or reliability, with the intent to induce Schweiger to rely on the flawed specifications to Schweiger's detriment.

Compl. ¶ 105.

Pursuant to RCFC 8(f), we are to construe the pleadings "as to do substantial justice." Consistent with this rule, "[t]he allegations of a complaint must be read as a whole and construed liberally." *International Fidelity Insurance Co. v. United States,* 27 Fed.Cl. 107, 109 (1992). Despite the tremendous burden of proof the plaintiff will face to demonstrate bad faith on the part of the government, the court cannot properly deny Schweiger the opportunity to present its argument in that regard. Accordingly, although Schweiger does not specifically incorporate the term "bad faith" into its complaint, its allegations are: (1) suggestive of such conduct and, construed liberally, are sufficiently well pled to survive the government's 12(b)(4) motion to dismiss; and (2) warrant further ventilation of the issue by plaintiff.

## B. Breach of Implied Warranty

In Count III of its complaint, plaintiff alleges a breach of implied warranty. Insofar as this court can discern, Schweiger's argument on this point is that the government's obligation to act in good faith provides a grounds for recovery on its claims of breach of implied warranty.

■ Schweiger correctly points out that every government contract impliedly obligates its parties to perform their duties in good faith. *See Asco–Falcon II Shipping Co. v. United States,* 18 Cl.Ct. 484, 491–92 (1989). *See also Morris v. United States,* 33 Fed.Cl. 733, 751 (1995). In substance, this obligation means "each party will cooperate in performance of the contract and will do nothing to hinder the other party's performance or expectations." *Jarvis v. United States,* 43 Fed.Cl. 529, 534 (1999). The implied duty of good faith and fair dealing "must attach to a specific substantive obligation, mutually assented to by the parties.' " *State of Alaska v. United States,* 35 Fed.Cl. 685, 704 (1996). *See also Price v. United States,* 46 Fed.Cl. 640 (2000). That is, the

implied duty of good faith and fair dealing "does not form the basis for wholly new contract terms, particularly terms which would be inconsistent with the express terms of the agreement." *Jarvis,* 43 Fed.Cl. at 534.

Accordingly, Schweiger's claim of good faith and fair dealing will be reviewed under plaintiff's other contractual rights and claims and will be subsumed thereunder. The implied duty of good faith and fair dealing does not confer on plaintiff any rights or grounds for recovery other than those that are contractually based.

▪ In order to prove a claim based on the government's breach of its implied obligation of good faith and fair dealing, courts have held that the contractor must present "well-nigh irrefragable proof" to rebut the presumption that government officials are presumed to act in good faith in the discharge of their duties. *Kalvar Corp. v. United States,* 211 Ct.Cl. 192, 543 F.2d 1298, 1301–02 (1976); *Morris v. United States,* 33 Fed.Cl. 733, 751 (1995); *Torncello v. United States,* 231 Ct.Cl. 20, 681 F.2d 756, 770 (1982) (stating that "the government, unlike private parties, is assumed always to act in good faith, subject only to an extremely difficult showing by the plaintiff to the contrary").

▪ As discussed *supra,* Schweiger alleges the government acted in bad faith by issuing solicitation specifications that were knowingly and intentionally false and failing to disclose the intended scope of work involved in the Social Security Administration remodeling project. Accordingly, Schweiger has stated a claim of breach of the implied duty of good faith and fair dealing.

**C. Whether plaintiffs state a claim for breach of contract and breach of express warranty through their argument that 48 C.F.R. §§ 16.504(a)(1), (a)(4)(iii) and (b) are incorporated into the contract by operation of law**

In support of its claim of breach of contract the plaintiff argues that the GSA breached its contract by failing to follow certain FAR rules which are incorporated into the contract by virtue of the Christian doctrine. *See G.L. Christian & Associates v. United States,* 312 F.2d 418, 160 Ct.Cl. 1, *reh'g denied,* 320 F.2d 345, 160 Ct.Cl. 58, *cert. denied,* 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963).

The plaintiff's primary argument in opposition to defendant's motion to dismiss is that the GSA breached its contractual obligations by violating FAR §§ 16.504(a)(1), (a)(4)(iii) and (b) which are incorporated into the parties' contract by virtue of the Christian Doctrine. Schweiger alleges that FAR § 16.504 requires the government to provide its "good faith, best estimate of quantities that will be required in an IDQ contract." Opposition at 9. Under 48 C.F.R. § 16.504(a)(1), the FAR provides that "[t]he contracting officer may obtain the basis for the maximum from records of previous requirements and consumption, or by other means, but the maximum quantity should be realistic and based on the most current information available." Pursuant to 48 C.F.R. § 16.504(a)(4)(iii), the government must include in an IDQ solicitation "a statement of the work, specifications or other description, that reasonably describes the general scope, nature, complexity, and purpose of the supplies or services to be acquired under the contract in a manner that will enable a prospective offeror to decide whether to submit an offer."

Schweiger also contends that the GSA violated FAR § 16.504(b) and therefore breached the contract because this regulation forbids the government from including in an IDQ contract large-scale, design-build construction projects the cost of which are capable of ascertainment. 48 C.F.R. § 16.504(b) provides:

*Application.* An indefinite-quantity contract may be used when the government cannot predetermine, above a specified minimum, the precise quantities of supplies or services that will be required during the contract period, and it is inadvisable for the government to commit itself for more than a minimum quantity. An indefinite-quantity contract should be used only when a recurring need is anticipated.

The crux of the government's argument in reply to Schweiger's opposition is that the Christian doctrine does not operate to trans-

form regulations into contract clauses. It contends that the Christian doctrine is narrower in scope, and only requires a court to incorporate certain regulations into the parties' contract that was required by regulation to be included in the contract. The government's position is that because all the applicable mandatory clauses were included in the contract (a fact that Schweiger does not dispute), it follows that the government has not violated any law by failing to include the regulations in the contractual provisions.

The court finds that it is unnecessary to determine whether these regulations are incorporated into the parties' contract. Even assuming we were to decide the regulations were incorporated, they would do nothing to impact the outcome in this case. Incorporating these regulations, would not change the fact that, to prevail in this case, the plaintiff must establish its claim based on the applicable legal standards.

In sum, Schweiger's allegations on counts I–III do possibly state a claim upon which relief could be granted, and therefore are adequate to survive the government's motion to dismiss. Schweiger has presented sufficient evidence to survive the government's motion to dismiss and the court holds that plaintiff may be permitted the opportunity to specifically argue its allegations of bad faith. Additionally, the facts as pled have raised possible issues of: (1) cardinal change; (2) constructive change; (3) potential waiver of the foregoing; and (4) breach of the duty of superior knowledge.

## II. Motion to Dismiss for Lack of Subject Matter Jurisdiction—RCFC 12(b)(1)

The government contends in its motion to dismiss that Counts IV–VI of Schweiger's complaint should be dismissed for lack of jurisdiction. RCFC 12(b)(1), which is identical to Rule 12(b)(1) of the Federal Rules of Civil Procedure, provides for dismissal of a claim for a "lack of jurisdiction over the subject matter." Fed.R.Civ.P. 12(b)(1); RCFC 12(b)(1). If there is no jurisdiction, this court must dismiss the action.

The non-moving party bears the burden of establishing jurisdiction by a preponderance of the evidence. *Thomson v. Gaskill*, 315 U.S. 442, 62 S.Ct. 673, 86 L.Ed. 951, 315 U.S. 442 (1942); *Cedars–Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed.Cir.1993); *Reynolds v. Army & Air Force Exchange Serv.*, 846 F.2d 746, 748 (Fed.Cir.1988). In ruling on a motion to dismiss for lack of subject matter jurisdiction, this court must construe all allegations of fact in favor of the nonmovant. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974), *Gibbs v. Buck*, 307 U.S. 66, 59 S.Ct. 725, 83 L.Ed. 1111 (1939). Significantly, a decision to dismiss an action for a lack of jurisdiction does not carry *res judicata* effect, and therefore does not present a bar to a subsequent action on the merits in a court of competent jurisdiction. *Do–Well Machine Shop, Inc. v. United States*, 870 F.2d 637, 640 (Fed.Cir.1989); *Cubic Defense Systems, Inc. v. United States*, 45 Fed.Cl. 239, 248 (1999).

### A. Misrepresentation

#### 1. Whether this court has jurisdiction over Count IV—Fraudulent Misrepresentation

The government contends that Count IV of Schweiger's claim, wherein it alleges fraudulent misrepresentation, should be dismissed for lack of subject matter jurisdiction. The crux of its argument is (1) misrepresentation is a tort over which this court lacks jurisdiction; and (2) misrepresentation does not lie within any exception to this court's jurisdictional bar on torts. Schweiger responds by arguing that its claim of fraudulent misrepresentation lies within an exception to this court's jurisdictional bar on torts because it involves an allegation that the government tortiously breached its contract.

Pursuant to the Tucker Act, 28 U.S.C. § 1491, this court has jurisdiction:

[T]o render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

■ The government correctly argues that as a general rule this court does not have jurisdiction over tort claims against the United States. *Nutrite Corp. v. United States*, 43 Fed.Cl. 297, 305 (1999) (citing *Berdick v. United States*, 222 Ct.Cl. 94, 100, 612 F.2d 533, 536 (1979)). *See also Brown v. United States*, 105 F.3d 621, 623 (Fed.Cir.1997); *Golden Pacific Bancorp. v. United States*, 15 F.3d 1066, 1069 n. 8 (Fed.Cir.1994).

It is firmly established that misrepresentation is a tort. *See United States v. Neustadt*, 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961); *Somali Development Bank v. United States*, 205 Ct.Cl. 741, 508 F.2d 817, 821 (1974); *Aetna Casualty and Surety Company v. United States*, 228 Ct.Cl. 146, 655 F.2d 1047, 1059 (1981). Thus, for this court to hear Count IV of Schweiger's claim alleging fraudulent misrepresentation, it must fall within an exception to the jurisdictional bar to this court hearing "claims sounding in tort."

■ As the government acknowledges, there is an exception to this court's jurisdictional bar on hearing claims sounding in tort. Jurisdiction is proper in this court over claims of "tortious breach" of contract. *Morris v. United States*, 33 Fed.Cl. 733, 742 (1995) (citing *L'Enfant Plaza Properties v. United States*, 645 F.2d 886, 892, 227 Ct.Cl. 1 (1981)). *See also Summit Contractors, Inc. v. United States*, 22 Cl.Ct. 54, 56 (1990) ("[T]he court has repeatedly asserted jurisdiction over claims based on tortious breach of a government contract.") This exception applies where the plaintiff's tort claim is "'entirely dependent on, and in fact evolves from the contract.'" *CTA Incorporated, v. United States*, 44 Fed.Cl. 684, 698 (1999) (quoting *Dureiko v. United States*, 42 Fed.Cl. 568, 582 (1998)). *See also Edwards v. United States*, 19 Cl.Ct. 663, 669 (1990). Where the plaintiff has stated breach of contract claims, "the fact that the alleged breach is also tortious does not foreclose Tucker Act jurisdiction." *Wood v. United States*, 961 F.2d 195, 198 (Fed.Cir.1992) (citation omitted).

■ In this case, Schweiger's claim of fraudulent misrepresentation meets this test, as it is in substance a "claim for breach of contract by misrepresentation." *Badgley v.* *United States*, 31 Fed.Cl. 508, 514 (1994). As discussed *supra*, Schweiger has stated a claim upon which relief could be granted on its breach of contract claims. The core facts upon which the breach of contract claims are based are the same facts upon which the misrepresentation claim is based. Schweiger alleges, *inter alia*, that (1) the GSA knew or should have known that it would give substantial weight to the Pricing and Estimated Quantities schedule yet it either intentionally or with reckless disregard failed to factor the materials and services required for the SSA project into those estimates; and (2) that the government was to have described the general scope and complexity of the services to be acquired under the contract and failed to do so. There is a sufficient nexus between these allegations and the government's contractual obligations. Thus, this court has jurisdiction to hear Count IV.

### 2. Whether this Court has jurisdiction over Counts I–III

Although the government never formally argues in its Motion to Dismiss that this court should dismiss Counts I–III pursuant to Rule 12(b)(1), it does state in a footnote that "[a]s an alternative to dismissing counts I–III for failure to state a claim, the Court could dismiss them as tort claims of misrepresentation over which the Court lacks jurisdiction." Motion to Dismiss at 23, n. 7. The government's suggestion that this court lacks jurisdiction over Counts I–III is without merit, as Schweiger has stated a claim upon which relief could be granted for breach of contract. As such, its claims are not based solely on a misrepresentation theory such that they fall outside of Tucker Act jurisdiction.

Accordingly, insofar as the government argues counts I–III should be dismissed pursuant to Rule 12(b)(1), the motion is denied.

### B. Counts V and VI

#### (1) Count V–Declaratory Judgment vs. GSA

In its complaint, Schweiger seeks a declaratory judgment against GSA holding "IDQ specifications deficient as a matter of law

where they bear no rational relationship to actual requirements within the G.S.A.'s superior knowledge at the time of solicitation . . . and awarding Schweiger its reasonable attorneys fees in bringing this action, and for such other and further relief as this Court deems proper under the circumstances." Compl. at ¶ 116. Plaintiff contends that the purpose of this relief is to clarify obligations pertaining to the contract at issue in this case as well as future IDQ contracts so as to permit a "true meeting of the minds between owner and bidder, and to create a fair and competitive venue for continued use of the IDQ contract." *Id.* Schweiger argues this court has jurisdiction to hear these claims pursuant to 28 U.S.C. § 1491(b)(2), and 28 U.S.C. § 1491(a)(2).

■ The government argues that Schweiger's claims for declaratory relief fall outside the purview of the this court's jurisdiction. Motion to Dismiss at 23–26. This court is a court of limited jurisdiction. One limitation upon its jurisdiction is that this court is generally precluded from issuing declaratory judgments. *United States v. King,* 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969) (holding that declaratory judgments fall outside the scope of the Court of Claims' jurisdiction). *See also Brown v. United States,* 105 F.3d 621, 624 (Fed.Cir.1997).

■ In certain limited circumstances this court can, however, issue declaratory relief. For example, pursuant to 28 U.S.C. § 1491(b)(2) this court may grant declaratory judgments in the context of a bid protest. Clearly, the instant action is not a bid protest. This court may also issue declaratory rulings that are "incident of and collateral to" a money judgment. *James v. Caldera,* 159 F.3d 573, 580–81 (Fed.Cir.1998) (citing 28 U.S.C. § 1491(a)(2)). *See also Pauley Petroleum, Inc. v. United States,* 219 Ct.Cl. 24, 37–38, 591 F.2d 1308, 1315–16 (1979); *New York Power Authority v. United States,* 42 Fed.Cl. 795, 802 (1999). Thus, "merely because the court must make a ruling of law . . . in order to arrive at a money judgment does not render this court's decision a 'declaratory judgment banned under *King.*'" *Pauley Petroleum,* 591 F.2d at 1315.

■ In this case, Schweiger seeks a declaratory judgment against GSA holding "IDQ specifications deficient as a matter of law where they bear no rational relationship to actual requirements within the G.S.A.'s superior knowledge at the time of solicitation . . . and awarding Schweiger its reasonable attorneys fees in bringing this action, and for such other and further relief as this Court deems proper under the circumstances." Compl. at ¶ 116. In order to ultimately resolve Schweiger's claim for money damages, this court will not need to draw such a sweeping conclusion. Accordingly, the court agrees with the government that this court lacks jurisdiction to enter the requested declaratory judgment against GSA. The court notes that it does have jurisdiction to decide *in this case* a claim based on breach of contract for failure to disclose superior knowledge, to the extent Schweiger alleges such a claim.

It does not appear that the government moves to dismiss Schweiger's request for attorney's fees, and the court notes that it does have jurisdiction to award attorney's fees, expenses, and costs authorized by The Equal Access to Justice Act, 28 U.S.C. § 2412.

**(2) Schweiger's "motions" to dismiss Count V (in part) and Count VI without prejudice**

As discussed above, in count V of its complaint, Schweiger seeks a declaratory judgment holding that "IDQ specifications [are] deficient as a matter of law where they bear no rational relationship to actual requirements within the G.S.A.'s superior knowledge at the time of solicitation." Compl. at ¶ 116. In addition, it asks this court to enjoin "future IDQ bid preparations incorporating large scale construction projects into an IDQ type contract." *Id.*

Count VI requests a declaratory judgment holding: (1) Schweiger's protest concerning the award to Repairs Unlimited was timely filed; (2) that the GSA's non-competitive award to Repairs Unlimited violated the Competition in Contracting Act; (3) that GSA is enjoined from granting further noncompetitive awards in similar situations; and

(4) that Schweiger can recover reasonable costs and expenses incurred in conjunction with the protest.

On May 6, 1999, the government filed its motion to dismiss, wherein it moves to dismiss Count V of Schweiger's complaint and Count VI of Schweiger's complaint for lack of subject matter jurisdiction. It additionally argues in conjunction with Count VI that Schweiger's protest was untimely.

Schweiger filed its suggestions in opposition to defendant's motion to dismiss on July 19, 1999. In this document, it states that "Schweiger hereby dismisses its requested relief in Count V of its Complaint insofar as it seeks an order 'enjoining future IDQ bid preparations incorporating large scale construction projects into an IDQ type contract.'" Opposition at 37. The government's reply was that this reference in Schweiger's opposition was insufficient to amend the complaint because it was not in the form of a motion.

In addition to filing its opposition on July 19, 1999, Schweiger also filed a separate document captioned "Stipulation of a Partial Dismissal." In this document Schweiger states that it "hereby stipulates to the dismissal its claims in Count VI of its Complaint, without prejudice." The government filed its opposition to this document on October 5, 1999. It argues: (1) that it never stipulated to the dismissal of Count VI without prejudice and; (2) that it objects to the voluntary dismissal of count VI to the extent that it would be without prejudice because it has already expended substantial resources in briefing Count VI.

RCFC 41(a) and (b) govern the dismissal of actions. These rules provide:

**Rule 41. Dismissal of Actions.**

(a) **Voluntary Dismissal; Effect Thereof.** *(1) By Plaintiff; by Stipulation.*
... [A]n action may be dismissed by the plaintiff without order of court (A) by filing a notice of dismissal at any time before service of the answer or a response, whichever first occurs, or (B) by filing a stipulation of dismissal signed by all parties who have appeared in the action. Unless otherwise stated in the notice of dismissal or

stipulation, the dismissal is without prejudice ...

*(2) By Order of the Court.*
Except as provided [above] an action shall not be dismissed at the plaintiff's instance save upon order of the court and upon such terms and conditions as the court deems proper ... Unless otherwise specified in the order, a dismissal under this paragraph is without prejudice.

Thus, it appears that Schweiger's motion to dismiss part of Count V in its Opposition and its Stipulation to Dismiss Count VI are ineffective to this end because they were not filed before service of the answer and they are not signed by all parties. Dismissal is, however, still possible by order of the court, "upon such terms and conditions as the court deems proper." RCFC 41(a)(2). Accordingly, the court deems the document captioned "Stipulation of a Partial Dismissal" to be a motion to dismiss Count VI of the complaint without prejudice. The court deems Schweiger's statement in its opposition that it "hereby dismisses its requested relief in Count V of its Complaint wherein it seeks an order 'enjoining future IDQ bid preparations incorporating large scale construction projects into an IDQ type contract' to be a motion to dismiss the stated part of Count V without prejudice."

■ This court has considerable discretion in deciding whether to dismiss a case with or without prejudice. *See Deuterium Corp. v. United States*, 21 Cl.Ct. 132, 134 (1990). Such dismissal may be overturned only if the Federal Circuit or Supreme Court finds an abuse of discretion. *See Gagnon v. United States*, 1997 WL 842379, *6, United States Court of Federal Claims, Office of the Special Masters, (July 31, 1997) (citing *Templeton v. Nedlloyd Lines*, 901 F.2d 1273, 1274–75 (5th Cir.1990)); *Herring v. City of Whitehall*, 804 F.2d 464, 466 (8th Cir.1986).

■ Generally, dismissal by order of the court is without prejudice, and will be interpreted as such absent an express statement to the contrary. RCFC 41(a)(2). The court may offer reasonable grounds to dismiss an action with prejudice. *Deuterium*, 21 Cl.Ct. at 134 (citing *Link v. Wabash R.R.*

Co., 370 U.S. at 629–33, 82 S.Ct. 1386; *Durham v. Florida East Coast Ry. Co.*, 385 F.2d 366, 367–68 (5th Cir.1967)). Although no "precise formula" exists for determining whether an action should be dismissed with prejudice, the court must consider the equities of the case and give due regard to the interests of both parties. *Deuterium*, 21 Cl. Ct at 134 (citing *Cone v. West Virginia Pulp & Paper Co.*, 330 U.S. 212, 67 S.Ct. 752, 91 L.Ed. 849 (1947); *Le Compte v. Mr. Chip, Inc.*, 528 F.2d 601 (5th Cir.1976)). This court may dismiss an action with prejudice if it finds "[t]he government has devoted considerable time and effort to preparing the case .. [a]nd it may cause the government expense and inconvenience if the case now were put in possible limbo." *Alumni Ass'n of Univ. of North Carolina, Inc. v. United States*, 223 Ct.Cl. 765, 767, 650 F.2d 287 (1980). *See also Deuterium*, 21 Cl.Ct. at 135 (stating that "[d]ismissal with prejudice is appropriate where there have been extensive proceedings with a trial clearly in sight"); *Gagnon; Sherrit v. United States*, 1997 WL 759610, United States Court of Federal Claims, Office of the Special Masters, (Oct. 23, 1997).

In this case, the government clearly expended considerable resources in developing the arguments presented in its motion to dismiss that this court does not have jurisdiction over plaintiff's prayer for injunctive relief in Count V and that this court does not have jurisdiction over Count VI. Moreover, Schweiger has offered no justification whatsoever to support its argument that part of Count V and Count VI should be dismissed without prejudice. For these reasons, Count V (insofar as it seeks prospective injunctive relief), and Count VI are dismissed with prejudice.

## III. Motion to Lift Stay of Discovery

On May 30, 2000, plaintiff moved to lift the stay of discovery that has been in place since May 5, 1999. On June 12, 2000, the government filed its opposition to Schweiger's motion. This court has discretion to determine questions of the scope and conduct of discovery. *Florsheim Shoe Co. v. United States*, 744 F.2d 787, 797 (Fed.Cir.1984). The court finds that because this case has been pending for quite some time and because the motion to dismiss has now been decided, the parties may go forward with discovery. Accordingly, the plaintiff's motion to lift stay of discovery is granted.

## CONCLUSION

It is hereby **ORDERED** that:

(1) Defendant's 12(b)(4) motion to dismiss counts I–III is **DENIED.**

(2) Defendant's 12(b)(1) motion to dismiss count IV is **DENIED.**

(3) Insofar as the defendant argues counts I–III should be dismissed pursuant to RCFC 12(b)(1) the motion is **DENIED.**

(4) Defendant's 12(b)(1) Motion to Dismiss the claim seeking declaratory relief in Count V is **GRANTED.**

(5) The court **DEEMS** the document captioned "Stipulation of a Partial Dismissal" to be a motion to dismiss Count VI of the complaint without prejudice.

(6) The court **DEEMS** Schweiger's statement in its opposition that it "hereby dismisses its requested relief in Count V of its Complaint wherein it seeks an order 'enjoining future IDQ bid preparations incorporating large scale construction projects into an IDQ type contract' to be a motion to dismiss the stated part of Count V without prejudice."

(7) Count V, insofar as it seeks prospective injunctive relief, and Count VI are **DISMISSED WITH PREJUDICE.**

(8) The plaintiff's motion to lift stay of discovery is **GRANTED.**

(9) In any further dispositive pleadings or proceedings before this court the parties must also address the following issues:

(a) Whether there is a clause in the contract at issue concerning changes? If so, what does it provide?

(b) Do the doctrines of constructive change and/or cardinal change generally apply in the IDQ contract context?

(c) Was there a cardinal change in this case?

(d) Was there a constructive change in this case?

(e) Did the government breach any duty to disclose superior knowledge?

(f) Did plaintiff waive any right to claim constructive change?

(g) Did plaintiff waive any right to claim cardinal change?

(10) On or before **March 23, 2001**, the parties shall **FILE** a Joint Status Report indicating the progress the parties have made toward completion of discovery.