**ABATEMENT CONTRACTING CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No.  97–770 C.

United States Court of Federal Claims.

Nov. 26, 2003.

Douglas L. Patin, Washington, D.C., attorney of record for plaintiff, with whom was Conrad C. Ledoux.

Elizabeth G. Candler, United States Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., with whom were Kathryn A. Bleecker, Assistant Director; David M. Cohen, Director, Commercial Litigation Branch; and Robert D. McCallum, Jr., Assistant Attorney General, for defendant.

## *OPINION*

MEROW, Senior Judge.

On June 11, 1993, the United States Naval Academy solicited bids for a "Requirements Contract for Asbestos Removal and Insulation Installation, U.S. Naval Academy and U.S. Naval Station, Annapolis, Maryland" with an estimated cost of between $500,000.00 and $1,000,000.00. Pl.App. 001, 003–009. By Amendment/Modification No. 0001 dated June 14, 1993, the Solicitation was amended from a requirements to an indefinite quantity contract. Pl.App. 010–014. The indefinite quantity contract ("Contract") made it clear that it was not a fixed-price contract, that there were no guarantees as to the amount of work, and that delivery orders would determine the amount of work:

CONTRACT TYPE: This is an indefinite quantity contract with no fixed contract price. The actual amount of work to be performed ... will [be] determined by the Officer in Charge of Construction or his properly authorized representative, who will issue written delivery orders to the contractor. The entire work authorized under this contract is that which is performed upon issuance of a delivery order. The unit price cited by the contractor on the Schedule of Prices will be the basis for payment of such work authorization. The Government makes no representation as to

the number of delivery orders or actual amount of services which will in fact be requested.

Pl.App. 012, ¶ 1.5.

Attached to the Solicitation was a Schedule itemizing supplies and services to be provided by subline item number, estimated quantity, unit price, and total price for the estimated quantity.[1]

Referencing FAR § 52.216–22 INDEFINITE QUANTITY (Apr.1984),[2] the Contract again advised that it was an indefinite quantity contract and "[t]he quantities of supplies and services specified in the Schedule are estimates only and are not purchased by this contract." *Id.*, ¶ 1.5.1(a). The government was only obligated to purchase the Contract minimum:

> Delivery or performance shall be made only as authorized by orders issued in accordance with the Ordering clause. The Contractor shall furnish to the Government, when and if ordered, the supplies or services specified in the Schedule up to and including the quantity designated in the Schedule as the "maximum." The Government shall order at least the quantity of supplies or services designated in the Schedule as the "minimum."

Pl.App. 012, ¶ 1.5.1(b).

Initially, the Contract minimum was $3,000.00. Pl.App. 013, ¶ 1.5.2. Through Amendment/Modification No. 0002, dated July 2, 1993, the minimum was raised to $50,000.00.[3] Pl.App. 015–016. J. Kevin DeVaughn, plaintiff's president, was aware of the $50,000.00 Contract minimum. Def.App. 192 (DeVaughn dep.), p. 86, ll. 4–12; Def.

Statement of Proposed Findings No. 7 and Pl. Response.

If the government failed to order the Contract minimum it could terminate the Contract for convenience.

> MINIMUM AND MAXIMUM QUANTITIES (NAVFAC)(DEC 1991) As referred to in paragraph (b) of the Indefinite Quantity clause of Section 01010, the contract minimum quantity is a total of $3,000. Should the Government fail to place orders totalling the amount of the contract minimum quantity, the provisions of [sic] clause entitled, "Termination for Convenience of the Government" shall apply to the unordered amount of the contract minimum quantity. The maximum quantity shall not be exceeded except as may be provided for by formal modification to the contract.

Pl.App. 013, ¶ 1.5.2.

Under Paragraph 3.13, the estimated total quantity was the sum of the total estimates for the Scheduled items. "The estimated total quantity is the maximum limit of the contractor's obligation to deliver and the Government's obligation to order." Pl.App. 009.

On or about October 22, 1993, the Navy accepted plaintiff's bid of $817,451.83.[4] Pl. App. 002, 019. Plaintiff was requested to provide a performance bond in the penal sum of $817,451.83 and a payment bond in the amount of $408,725.92. Pl.App. 019.

The subject dispute involves a relatively small part of the Contract.[5] At issue is subline item 001GGD, "[e]ncapsulate loose asbestos dust, debris or waste with or without scaffolding." Estimated quantity was 37

---

1. The government's estimate dated June 14, 1993, includes a 29 page itemized Schedule (Specification No. 21–93–0623) with a total estimated price of $989,057.00. Pl.App. 021–051. Although only one page of a blank Schedule (No. 21–93–0623) was included in Plaintiff's Appendix, indexed as "Solicitation Specification," the court presumes that a complete blank set was distributed with the Solicitation. Pl.App. 003.

2. Federal Acquisition Regulations ("FAR") are contained in 48 C.F.R. § 1.101 *et seq.*

3. The Amendment also changed the minimum order from $100.00 to $500.00. Pl.App. 015.

4. While plaintiff's bid was $818,466.98, the Navy's acceptance was "not to exceed $817,451.83." Pl.App. 002. The difference between these two figures is not material to the court's findings.

5. The court notes that the disputed subline item 001GGD with a total price of the estimated quantity of $185.00 was not a major component of the Contract, constituting less than .02 percent of plaintiff's total successful bid of $817,451.83.

square feet. Plaintiff's bid was $5.00 a square foot for a total price of $185.00.

| Item No. | Supplies/Services | Unit | Est Qty | Unit Price | Total Price of Est Qty |
|---|---|---|---|---|---|
| 001GGD | Encapsulate loose asbestos dust, debris or waste with or without scaffolding | S.F. | 37 | 5 | 185 |

Pl.App. 020. The government's estimate for this subline item was $3.75 per square foot for a total price of $139.00. Pl.App. 036.

As provided under the Contract, quantities of supplies or services were ordered by the Navy's issuance of delivery orders. Pl.App. 012, ¶ 1.5.1(b)(referencing FAR § 52.216–22)("Delivery or performance shall be made only as authorized by orders issued in accordance with the Ordering clause."); Pl.App. 013, ¶ 1.6.1(a)(referencing FAR § 52.216–18)("Any supplies and services to be furnished under this contract shall be ordered by issuance of delivery orders by the individuals or activities designated in the Schedule."). In the event of a conflict between a delivery order and the Contract, the Contract prevailed. Pl.App. 013, ¶ 1.6.1(b)(referencing FAR § 52.216–18). Delivery Order No. 0003, dated Dec. 23, 1993, totaling $12,706.39 and the first to include subline item 001GGD, requested 64 square feet of encapsulation ("encapsulate loose asbestos waste on block wall") at $5.00 per square foot for a total of $320.00. Pl.App. 105–07. With this delivery order the original estimation of 37 square feet was exceeded. In performing the subline item 001GGD work for Delivery Order No. 0003, plaintiff encapsulized loose asbestos dust, debris or waste by application of a water-based vinyl acrylic product applied by airless sprayer.[6] Pl. Statement of Proposed Findings, DeVaughn Aff., ¶ 8.[7] On February 4, 1994, plaintiff requested a change order of $4,555.00 which included $1,120.00 for encapsulating three walls totaling 224 square feet (at $5.00 a square foot).

Plaintiff noted that "this seems to be a lot in relation to the original amount ..." Pl.App. 134–35. The request was approved on April 20, 1994 in Amendment/Modification 0003–03, increasing Delivery Order No. 0003 to $17,261.39. Pl.App. 136–37. Neither the request for a change order nor the Amendment/Modification used the subline item 001GGD. The Amendment/Modification included the following release, language repeated in subsequent transactions:

> The foregoing is agreed to as constituting full and complete equitable adjustment and compensation attributable to the facts or circumstances giving rise to this change including but not limited to, any changes, differing site conditions, suspensions, delays, rescheduling, acceleration, impact or other causes as may be associated therewith.

Pl.App. 137 ("Release Language").

A dispute over the square footage charge for subline item 001GGD arose. Plaintiff alleges it learned on December 22, 1993 that a subsequent Delivery Order was going to omit subline item 001GGD despite the necessity under state and federal regulations to encapsulate the work area. The Navy said it was not going to pay $5.00 a square foot for encapsulation and would bring in another contractor if need be to do that work. Plaintiff insisted that it was entitled to the Contract price of $5.00 per square foot.

According to plaintiff, in a December 27, 1993 meeting, the Navy expressed its displeasure with plaintiff's position that it should continue to be paid $5.00 per square

---

6. The asbestos abatement plan plaintiff submitted to the Navy for approval, as required by Contract Specification 02080–4, ¶ 1.3.2.1, provided that encapsulation "... to loose asbestos dust, debris or waste identified to be encapsulated [would be] by application of a water based vinyl acrylic product applied by brush or airless sprayer. On porous surfaces a second coat may be required. The concentration of the applied material shall vary depending on the surface to be coated." Pl.App. 056 & 095.

7. Mr. DeVaughn's Affidavit is attached to Plaintiff's Separate Statement of Proposed Findings of Uncontroverted Facts.

foot for encapsulation. The Navy's Project Manager testified that he contemplated issuing a parallel indefinite quantities contract to another because plaintiff's representative was difficult to work with, and because plaintiff and the Navy were at an impasse over the price for additional encapsulation work.[8] Several Delivery Orders were issued that did not contain subline item 001GGD even though asbestos containment was required under either state or federal asbestos guidelines which where incorporated into the Contract.[9]

Plaintiff asserts that on December 30, 1993, the Navy issued Delivery Order No. 0006 for $3,333.80 to remove sprayed-on fireproofing contamination in a portion of Halligan Hallway. Pl.App. 110–111. The Delivery Order did not include any work under subline item 001GGD, although plaintiff alleges encapsulation was required under state and federal law. Pl. Statement of Proposed Findings Nos. 35–36.[10]

In a meeting on January 28, 1994, Navy representatives again stated that $5.00 a square foot for encapsulation was too high and subline item 001GGD would never be used in future Delivery Orders to plaintiff.[11]

During the meeting Navy representatives, according to plaintiff, spoke of asbestos "lockdown" as being distinct from asbestos encapsulation. The Navy had developed an $0.11 per square foot (or something close to that price) for "lockdown." Plaintiff proffers deposition testimony that neither the Contracting Officer nor the Project Manager could distinguish between encapsulation and lockdown.[12] DeVaughn Aff. ¶ 11; Pl.App. 256–260. The Navy "implicitly threatened [plaintiff] into negotiating a new unit price by stating that [plaintiff] would have to perform this work whether compensated for it or not (as it is required to be done as part of abatement) and if [plaintiff] wanted to be compensated at all for applying 'lock-down,' a price had to be submitted and negotiated." Pl. Statement of Proposed Findings No. 46. "In and around this time all payments to [plaintiff] for completed delivery orders (with more than $20,000 outstanding) were withheld." Id. No. 47; DeVaughn Aff. ¶ 12.

Plaintiff asserts that as a result of the government's "statements and threats at the [January] 28[13] meeting and under economic pressure due to withheld payments, at the demand of the Navy, I prepared and [plain-

---

**8.** Wayne Miller, the Navy's Planning and Estimating Supervisor did not recall stating that the Contracting Officer was upset with plaintiff's position that it should be paid $5.00 per square foot for encapsulation, and did not recall the Contracting Officer stating a parallel contract was going to be granted. Def. Response to Pl. Statement of Undisputed Facts No. 29. The Navy admitted that it issued orders for supplies or services for asbestos removal or for insulation installation to others during the term of plaintiff's contract. Pl.App. at 221.

**9.** Section 02080 of the Contract Specifications, entitled "Removal and Disposal of Asbestos Materials" governed removal and disposal of asbestos. Section 1.1.4 incorporated Maryland Department of the Environment "Application Package For License to Remove Encapsulate [A]sbestos in the State of Maryland." Pl.App. 053. Thereunder "encapsulate" was defined as "to coat, bind, or resurface walls, ceiling, pipes, or other structures to prevent friable asbestos from becoming airborne." § 26.11.21(D); Pl. App. 065.

**10.** The Navy argues the Delivery Order was not for removal of sprayed-on fireproofing contamination. The factual dispute is not material. The court notes, however, that Delivery Order No. 0006 was for asbestos removal in Halligan Hall

2nd floor hallway between Engineering and Employee Relations, including asbestos acoustical tile, insulation and loose asbestos waste, the latter consisting of 2,248 square feet at $0.10 per square foot. Pl.App. 110–11.

**11.** The government disagrees with plaintiff's specific allegations, asserting that Mr. Miller testified he does not recall stating that subline item 001GGD would never be used in future delivery orders. Def. Response to Pl. Statement of Proposed Findings No. 45. That factual disagreement is not material to the dispute before the court.

**12.** The government does not agree that the Contracting Officer's testimony suggests she was unable to distinguish between lockdown and encapsulation. However, as with the previously cited factual disputes, they do not preclude summary adjudication.

**13.** Both the DeVaughn Affidavit and Plaintiff's Proposed Findings reference the government's statements and threats at the "September" 28th meeting. Pl. Statement of Proposed Findings No. 49; DeVaughn Aff. ¶ 13. The court presumes the reference should have been to the January 28th meeting.

tiff] submitted a proposal/estimate for Delivery Order No. 6 ..." DeVaughn Aff., ¶ 13. On January 31, 1994, plaintiff presented proposals for encapsulation with sealant for existing wood surfaces and painted masonry at Halligan Hall ranging from 37 cents to 91 cents per square foot. Pl.App. 112–116. Amendment/Modification No. 0006–03 dated April 20, 1994 increased Delivery Order No. 0006 from $3,333.80 to $5,493.22 with the addition of the removal of 432 square feet of transite board and "lockdown" of the contained area of $976.00. Pl.App. 132–33. No square footage rate nor subline item number was given. The Amendment/Modification contained the Release Language. Pl.App. 133.

In an April 15, 1994 "Post Negotiation Memorandum" concerning Delivery Order No. 0006, Navy representative George Sazaklis wrote concerning the addition of "lockdown:"

> This change consisted of two parts. The first change was for "lockdown" of the contained area. The GE [government estimate?] was estimated at $950 and the contractor proposed $995 and the settled amount was $976 .... The reason this work was not negotiated prior to the work beginning was that there was a dispute as to the requirement for lockdown. After research it was discovered that there was no contractual requirement for lockdown, but there is an industry practice of doing the lockdown. It is the intent of the Government that a line item be negotiated and included in the contract for lockdown.

Pl.App. 117.

Plaintiff contends there was no true bilateral dispute as to the requirement for lockdown. The only "dispute" was the difference between what the Navy was contractually obligated to pay versus what they wanted to pay. DeVaughn Aff. ¶ 14.

On May 16, 1994, the Navy issued Delivery Order No. 0009 which included 30 feet of encapsulation of loose asbestos, subline item 001GGD, at $5.00 per square foot, for a total of $150.00, and subline item 001DDA, loose asbestos waste "decon surfaces," 1,035 square feet, at a unit price of $0.09 per square foot for a total of $93.15. Pl.App. 138–144. Plaintiff asserts that 1,035 square feet was encapsulated by application of a water based vinyl acrylic product via an airless sprayer. DeVaughn Aff. ¶ 15. Plaintiff subsequently wrote the Navy that Delivery Order No. 0009 should have included additional square footage of encapsulation. Pl. App. 157. Subsequent correspondence between plaintiff and the Navy cited conflicting directions, misinterpretations of the Contract, and the need to encapsulate asbestos as part of a comprehensive decontamination response. Pl.App. 158–168. On June 14, 1994, plaintiff submitted a proposal for changes to Delivery Order No. 0010 including 652 square feet of encapsulation of loose asbestos dust/debris at $5.00 a square foot. Pl.App. 169–170.

On June 17, 1994, George Sazaklis and Ms. McCount, his assistant, spoke with Mr. DeVaughn, requesting plaintiff's help "out of a jam" because there was no money for the 001GGD rate. Plaintiff agreed to perform under Delivery Order No. 0010 with the understanding that the encapsulation issue would be resolved in the near future.[14] DeVaughn Affidavit, ¶ 18.

Plaintiff alleges that encapsulation under subline item 001GGD was required but omitted from Delivery Orders Nos. 0010 and 0011.[15] Pl.App. 145; DeVaughn Aff. ¶¶ 16, 17; Pl.App. 150–156.

The June 23, 1994, Amendment/Modification to Delivery Order No. 0010, signed by both the Navy and Mr. DeVaughn, did not contain subline item 001GGD but increased the Delivery Order from $512.95 to $2,139.84 including decontamination of surfaces in the pit area originally 180 square feet at $0.09 per unit to 426 square feet at a unit price of $0.09 for a total of $38.34. The Amendment/Modification also added $1,687.00 to cut

---

14. Although the government disputes this allegation, this factual dispute is not material.

15. The court notes that Delivery Order No. 0011 includes encapsulation although under a different subline item number; specifically, 001GGA, ("encapsulate existing asbestos to remain")—10 square feet at $4.00 per square foot.

an opening in a tank, remove all debris from the bottom of the tank and "lockdown" the tank area. Pl.App. 175–176. The Amendment Modification contained the Release Language.

On June 29, 1994, Navy representatives told Mr. DeVaughn that a delivery order of approximately $70,000.00 was being held up because encapsulation was involved, and because plaintiff would not "cooperate," the Navy was considering giving the contract to another. "Implicit in this conversation was that if [plaintiff] 'cooperated' with regard to the price for encapsulation, delivery orders would be issued." [16] DeVaughn Aff. ¶ 19. By letter dated July 11, 1994, plaintiff "surrendered" and agreed to renegotiate the price for work under subline item 001GGD.

> Numerous Delivery Orders have been issued by you which have omitted incorporation of [subline item 001GGD Encapsulation] even though the nature of the projects required that this work be done. The primary reason provided by various government representatives for the omissions is the bid price for the item versus their perceived cost of doing that work. The price bid was based on the scheduled quantities of 37 s.f. At this point, it is apparent to all concerned that the scheduled quantities are vastly understated. Considering this fact, we agree that the price of this subline item may warrant adjustment and are willing to negotiate an adjustment on that basis.
>
> At your request, we have met with you in April and conducted preliminary negotiations in that respect. Should you wish to conclude negotiations in this matter, advise us in writing as soon as possible to avoid the burden placed on all concerned by issuance of incomplete Delivery Orders in the future.

Pl.App. at 177.

Following up on earlier discussions about adding a proposal for a new subline item for "lockdown," plaintiff asked for clarification in a July 26, 1994 letter:

> You have proposed adding a subline item called "Lockdown Encapsulant." Preliminary negotiations were conducted in early April to reach an agreeable price. Before we can conclude negotiations for this item, we request that you provide clarification. The clarification we request is that you define this item and outline the circumstances and extent that it would be incorporated into delivery orders.

Pl.App. 179.

On July 26, 1994, plaintiff also requested an equitable adjustment to Delivery Order No. 0011 including 220 square feet of necessary encapsulation work under subline item 001GGD. Pl.App. 180. According to plaintiff, the Navy threatened to "cuttoff" funding in a July 26, 1994 letter.[17] Pl.App. 181. Plaintiff questioned the propriety of holding up delivery orders to effectuate concessions in a July 27, 1994 letter. Pl.App. 182.

On July 28, 1995, plaintiff complained that it had not gotten any new delivery orders since the fiscal year starting October 1, 1994. The Navy responded that it thought the contract was for one year, had thus expired and the work had been committed to a third party. DeVaughn Aff. ¶ 21. In a July 29, 1994 meeting at which the encapsulation issue was discussed, the Navy informed plaintiff that it was going to add a new subline item for lockdown. *Id.* ¶ 22. In his Affidavit, Mr. DeVaughn summarized the respective position of the parties concerning asbestos encapsulation:

> At the meeting, Mr. Sazaklis stated the Navy wanted to add a subline item for "lockdown" at the price negotiated in April 1994 with regard to Delivery Order No. 6, which he believed to be fair and reason-

---

16. The government admits Mr. Miller acknowledged that he told Mr. DeVaughn that the Navy was estimating a future job worth approximately $70,000.00. That project was never funded. Def. Response to Pl. Statement of Proposed Findings, No. 82.

17. The referenced letter from the Navy noted that Naval Academy asbestos abatement project had been underway for five years, concentrating on the areas of greatest hazard. Funding for new removal efforts would be held up until completion of a management plan and the Navy requested that plaintiff "bear with us until the management plan is complete so we can fund removals or other processes as recommended in the plan." Pl.App. 181.

able. I explained that encapsulation and what the Navy required as "lockdown" involved the same scope of work. Mr. Sazaklis stated that encapsulation and "lockdown" are not the same thing. Wayne Miller stated that the encapsulation subline item had never been used on any contract in [sic] past and was not intended to be used in the future. Mr. Sazaklis and Ms. King told me that the Navy was under no obligation to issue further delivery orders and threatened that the Navy could terminate the contract for the government's convenience. Ms. Sazaklis then stated the government would not re-negotiate "lockdown"; and took the position that the price was set.

The government insisted that a new line item be negotiated despite the government's inability to explain the difference between "encapsulate" and "encapsulate with lockdown" since [plaintiff] had already been encapsulating under 001GGD in the same manner the government was describing the work to be performed under the new "encapsulation with lockdown".

DeVaughn Aff. ¶¶ 22 & 23.

On August 10, 1994, the Navy forwarded to plaintiff Amendments of Solicitation/Modifications of Contract, P00007 and P00008 ("Modifications"). Modification P00007 included subline item 001GGE "[e]ncapsulation

with Lock Down existing porous surfaces where asbestos is to be removed or decontaminated" at $0.23 per square foot with an estimated quantity of 50,000 square feet, increasing the total contract from "Not to Exceed $848,203.52" to a "Not to Exceed $859,703.52." [18] Pl.App. at 183–91. Modification P00007 also included the government's calculation of the $0.23 per square foot unit price for what was described in the form as "encapsulation" [19] and a listing of FAR contractual clauses that could be incorporated by reference. The Modification provided that it was entered into pursuant to the changes clause of FAR § 52.243–4.[20] Plaintiff alleges the price was unilaterally determined by the Navy.[21] Pl. Statement of Proposed Findings No. 97. The Modification contained the Release Language, repeated here for emphasis:

> The foregoing is agreed to as constituting full and complete equitable adjustment and compensation attributable to the facts or circumstances giving rise to this change including but not limited to, any changes, differing site conditions, suspensions, delays, rescheduling, acceleration, impact or other causes as may be associated therewith.

Pl.App. 185.

Under the Modification plaintiff agreed to provide encapsulation with lockdown services at 23 cents per square foot:

| Item No. | Supplies/Services | Unit | Est. Qty. | Unit Price | Total Price |
|---|---|---|---|---|---|
| 001GGE | Encapsulate with Lockdown Spray existing porous Surfaces where asbestos is to be removed or decontaminated. | SF | 50,000 | $0.23 | $11,500.00 |

**18.** Mike Allen, the government's project engineer, testified the work to be done under Modification subline item 001GGE was "what was being done before this came out." Pl.App. at 270–71 [31:24–32:12].

**19.** The form titled the work estimated as "encapsulation" and was backdated to January 6, 1994, because, plaintiff asserts, it would be properly prepared prior to plaintiff's prior proposal. Pl. App. 186.

**20.** 48 C.F.R. § 52.243–4 (1993) provides in part:

(a) The Contracting Officer may, at any time, without notice to the sureties, if any, by written order designated or indicated to be a change

order, make changes in the work within the general scope of the contract, including changes—
(1) In the specifications (including drawings and designs);
(2) In the method or manner of performance of the work;
(3) In the Government-furnished facilities, equipment, materials, services, or site; or
(4) Directing acceleration in the performance of the work.
(b) Any other written or oral order . . . .

**21.** The government disputes that the Navy unilaterally determined the unit price. This factual dispute is not material to the motion for summary judgment.

Pl.App. 193. Under reservations described hereinafter, Mr. DeVaughn signed Modification P00007 on August 15, 1994. Pl.App. 192.

As of August 23, 1994, the date Modification P00007 was executed by the government, the Navy had ordered $54,958.81 in supplies and services under the Contract which was above the $50,000.00 contract minimum. Def. Statement of Proposed Findings No. 23 and Pl. Response. After the execution of Modification P00007, the Navy ordered subline item 001GGE work from plaintiff for which plaintiff was paid.[22] Def. Statement of Proposed Findings Nos. 17, 18, & 19 and Pl. Responses.

Plaintiff asserts the original estimated quantities in the Contract were not accurate and were "guesstimates" at best. Despite its recorded importance and recommendations therefore, the Navy had not conducted a comprehensive asbestos survey of the Naval Academy and an asbestos operation and maintenance plan had not been developed. The Navy did not have any backup record to support the estimated 37 square feet in the Contract. A prior contract for asbestos removal and insulation included 37 square feet of encapsulation of loose asbestos dust, debris or waste. Pl. Statement of Proposed Findings No. 148.

After Modification P00007 was signed, the Navy ordered 35,504 square feet of encapsulation work through the new subline item 001GGE. Def. Statement of Proposed Findings No. 29 and Pl. Response. The govern-

ment points out and the plaintiff does not disagree, that Delivery Orders 0009, 0011, 0012, 0015 and 0016 which were subsequent to Modification P00007 and included orders under subline item 001GGE, contained a "Contractor's Release" signed by Mr. DeVaughn which stated:

[t]he undersigned Contractor does, and by the receipt of said sum shall, for itself, its successors and assigns, remise, release and forever discharge the Government, its officers, agents, and employees, of and from all liabilities, obligations and claims whatsoever in law and in equity under or arising out of said contract.

Def.App. at 84, 105, 112, 133, 150. See Def. Statement of Proposed Findings No. 20 and Pl. Response. Modification 3 to Delivery Order 0009, Modification 2 to Delivery Order 0011, and Modifications 0017–02 and 0017–05 signed by both parties contained the Release Language. Def.App. 80, 101, 161, 69.

On May 24, 1996, plaintiff submitted a certified claim to the Contracting Officer pursuant to the Contract Disputes Act of 1978 seeking an equitable adjustment of $193,800.88. In sum, plaintiff claimed that Modification P00007 was not binding. A total of 40,860 square feet of asbestos encapsulation work was performed for which plaintiff should have been paid $204,300.00 at the Contract rate of $5.00 per square foot. Plaintiff was paid $10,499.12 for this work. The claim for equitable adjustment was for the difference, $193,800.88.[23] Plaintiff also

---

22. Subsequent Delivery Orders included subline item 001GGE. Delivery Order 0009 was modified on December 16, 1994 to add 1,000 square feet of this subline item at a unit price of $0.23 for a total of $231.00; Delivery Order 0011 was modified on December 16, 1994 to add 220 square feet at a unit price of $0.23 for a total of $51.00; Delivery Order 0012 added additional asbestos removal and insulation of $5,501.22, including 3,750 square feet of subline item 001GGE for a total of $862.50; Delivery Order No. 0015 added additional asbestos removal of $3,334.26 including 1,792 square feet of subline item 001GGE for a total of $412.16; Delivery Order 0016 which added a total of $34,364.93 included 4,5978 square feet of subline item 001GGE for a total of $1,057.54; Delivery Order 0017 which added $35,754.61 to the contract, including 8,053 square feet of subline item 001GGE for a total of $1,852.19; Delivery Order

0017 was modified to include an additional 360 square feet of 001GGE tor a total of $82.80 and again modified to include an additional 6,530 square feet under 001GGE for another increase of $1,501.90. Def.App. 79–84, 100–105, 107–112, 128–156, 160–161, and 166–69.

23. Alternatively, plaintiff argued the Contract was for 745 calendar days; plaintiff had the right to expect the Navy would consider issuing delivery orders during the second year and did not take the risk that its bonding capacity would be tied up for a second year for no good reason, yet no delivery orders were issued in the second year. Accordingly, plaintiff sought recovery on a total cost basis of its direct labor, materials, subcontract and G & A expenses incurred on the contract in the amount of $215,301.74 to which a reasonable profit figure of 8% was applied. Af-

claimed that the Navy did not properly estimate the amount of encapsulation services that would be needed. Def.App. 195–207. On November 13, 1996, the Contracting Officer denied the claim on the basis that the government ordered a total of $175,383.83, far more than the Contract minimum of $50,000.00. Def.App. at 208–220.

Plaintiff's Complaint asserts the Navy should pay $5.00 per square foot for all the encapsulation work both under the Contract and Modification P00007. Count I seeks the differential between the $5.00 per square foot in the subline item 001GGD and the $0.23 received under subline item 001GGE, for a total of $193,800.88. In Count II plaintiff requests $60,163.00, the total cost of its direct labor, materials, subcontract, and G & A expenses plus an eight percent profit, minus payments received and accounts receivable.

Defendant has moved for summary judgment on plaintiff's breach of contract claim on three grounds: (1) in Modification P00007 and in each Delivery Order (or Modification), plaintiff released any breach of contract claim; (2) plaintiff's claim that Modification P00007 was signed under economic duress is not valid; and (3) because the government ordered the minimum quantity under the Contract, plaintiff's claim that the government failed to develop realistic estimated quantities is of no legal consequence.

In summary, plaintiff alleges it signed Modification P00007 due to the government's threats that if it did not sign, no further work or delivery orders would be issued under the Contract and that asbestos removal work would be given to others. The threat of no further delivery orders would have had a devastating impact upon plaintiff, which had its bonding capacity tied up. Genuine material factual issues concerning the duress surrounding Modification P00007 preclude summary judgment according to plaintiff. Plaintiff also contends there was no difference between the work required or done under subline item 001GGD and 001GGE, and alleged the Navy's culpability in preparing the estimated quantity of encapsulation involves factual issues that preclude summary adjudication.

ter subtracting payments received and accounts

### Summary Judgment Standards

Summary judgment is appropriate when there are no genuine disputes over material facts and the moving party is entitled to prevail as a matter of law. RCFC 56(c). *See Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed.Cir.1987). A genuine dispute concerning a material fact exists when the evidence presented would permit a reasonable jury to find in favor of the non-movant. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether there is a genuine issue of material fact, the court will assume the truth of the evidence presented by the non-moving party and draw all reasonable inferences therefrom in the non-movant's favor. *Id.* at 255, 106 S.Ct. at 2513. A fact is material if it would make a difference in the result of the case. Irrelevant or tangential factual disputes do not preclude the entry of summary judgment. *Id.* at 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *See also Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d 1253, 1257 (Fed.Cir.2001).

### Indefinite quantities contracts

An understanding of the nature of this indefinite delivery contract, particularly the government's obligations and the plaintiff's rights thereunder, is fundamental to the resolution of the parties' dispute. As explained in 48 C.F.R. § 16.501 (1993), there are three types of indefinite delivery contracts: definite quantity contracts, requirements contracts, and indefinite quantity contracts. Definite quantity contracts provide for delivery of a definite quantity of supplies or services, with deliveries to be scheduled as ordered by the government. 48 C.F.R. § 16.502 (1993). In a requirements contract (which this Contract was originally until amended) the government is obliged to fill all of its defined needs by purchasing exclusively from the contractor, but it does not commit to purchase any minimum quantity. 48 C.F.R. § 16.503 (1993). "A requirements contract required the contracting government entity to fill all of its actual requirements for supplies or services

receivable, plaintiff sought $60,163.99.

that are specified in the contract, during the contract period, by purchases from the contract awardee." *Travel Centre v. Barram,* 236 F.3d 1316, 1318–19 (Fed.Cir.2001). The effect, if not the intent, of plaintiff's assertions here is to require the government pay $5.00 per square foot for all its encapsulation needs.

■ Indefinite delivery, indefinite quantity contracts ("ID/IQ") obligate the government to purchase only a stated minimum quantity of supplies or services from the contractor, with deliveries to be scheduled as ordered by the government. Under FAR, ID/IQ contracts may be utilized " 'when the Government cannot predetermine, above a specified minimum, the precise quantities of supplies or services that the Government will require.'" *Varilease Tech. Group, Inc. v. United States,* 289 F.3d 795, 799 (Fed.Cir. 2002), quoting 48 C.F.R. § 16.504(b). *See also Travel Centre v. Barram,* 236 F.3d at 1318 (ID/IQ contracts provide flexibility to the government "for requirements that it cannot accurately anticipate"). When the government enters into an ID/IQ contract, it does not promise to fill all of its needs by purchasing from the contractor; it commits only to purchase the minimum quantity stated in the contract.

> An indefinite-quantity contract provides for an indefinite quantity, within stated limits, of specific supplies or services to be furnished during a fixed period, with deliveries to be scheduled by placing orders with the contractor.

48 C.F.R. § 16.504(a)(1993). *See also Ace–Federal Reporters, Inc. v. Barram,* 226 F.3d 1329, 1331 (Fed.Cir.2000); *J. Cooper & Assoc., Inc. v. United States,* 53 Fed.Cl. 8, 21 (2002), *aff'd* 65 Fed.Appx. 731 (Fed.Cir.2003)(having purchased the contract minimum, the government was free to order additional services or supplies from any other sources; the contractor was not the exclusive source).

■ The Contract here, by definition, content, admission by the parties, and under the undisputed material facts, is an indefinite delivery/indefinite quantity (ID/IQ) contract. The government ordered more than $50,000.00 in supplies and services, the Con-

tract minimum which is more than a nominal amount. As such, as recently explained by the Federal Circuit, with the purchase of at least the Contract minimum, the government's obligations thereunder were extinguished and plaintiff's claim for breach of contract fails as a matter of law.

> [O]nce the government has purchased the minimum quantity stated in an IDIQ contract from the contractor, it is free to purchase additional supplies or services from any other source it chooses. An IDIQ contract does not provide any exclusivity to the contractor. The government may, at its discretion and for its benefit, make its purchases for similar supplies and/or services from other sources.

*Travel Centre v. Barram,* 236 F.3d at 1319 (Fed.Cir.2001).

In *Travel Centre,* the General Services Administration (GSA) solicited bids for a one-year contract with four one-year optional extensions to provide travel management services for federal agencies in Maine, New Hampshire, and Vermont. In return for providing transportation and lodging reservations to government customers, the awardee would be compensated by commissions. Like the Contract before this court, the *Travel Centre* contract was titled an Indefinite Quantity Contract. The *Travel Centre* solicitation expressly provided that the contract to be awarded was an indefinite-delivery, indefinite-quantity contract with a guarantee of a minimum of $100.00 in revenue. While the solicitation indicated that bidders should base their bids on actual 1994 federal agency travel figures of $2,500,000.00 for the three states, the solicitation warned in three places that the figures were not guarantees, but were for informational purposes only. The solicitation also tempted bidders with the title of a "preferred source" for commercial travel management services going to the awardee. Prior to the submission of Travel Centre's final bid, GSA was informed that two federal agencies, comprising over half of the business in Maine, were no longer going to use the reservation service. GSA did not disclose this fact to Travel Centre who was subsequently awarded the contract.

Shortly after commencing performance, Travel Centre learned that the two major federal clients would not be using its services. Expected revenues did not materialize. Travel Centre closed one of its offices which was contrary to the contract terms. GSA then terminated the contract for default due to inadequate performance and because of the closure of an office, a termination that was later changed to one of government convenience. Travel Centre sued for breach of contract. A split decision of the General Services Administration Board of Contract Appeals awarded Travel Centre $42,546.00 representing lost business and accounting fees. Reasoning as cited above, the Federal Circuit reversed, concluding "[GSA's] less than ideal contracting tactics fail to constitute a breach." 236 F.3d at 1319. Travel Centre was not entitled to any relief. GSA was only required to purchase travel services that would net at least $100.00 in revenue, the contract minimum, which was satisfied by sales of more than $500,000.00 for which Travel Centre received commissions ranging from five to ten percent. *Id.*

The Federal Circuit in *Varilease Technology Group, Inc. v. United States*, 289 F.3d 795 (Fed.Cir.2002) reaffirmed that an ID/IQ contract has only a minimum purchase obligation. 289 F.3d at 799. Like the Contract before this court, the contract in Varilease "clearly, repeatedly, and unequivocally" identified itself as an ID/IQ contract. *See also J. Cooper & Assoc. v. United States*, 53 Fed.Cl. 8, 24 (2002)(government did not breach indefinite quantity contract by failing to order work in excess of the contract minimum regardless of work tasked to other contractors); *Dot Systems, Inc. v. United States*, 231 Ct.Cl. 765, 1982 WL 25218 (1982)(government only required to order minimum under an indefinite quantity contract).

The Contract as amended was clearly an ID/IQ contract with a minimum of $50,000.00 (there being no separate or particular Contract minimum for the subline item 001GGD), which plaintiff admits. Pl. Statement of Pro-

posed Findings Nos. 4 and 8. Accordingly, plaintiff could not have had a reasonable expectation of receiving orders more than the $50,000.00 minimum even if plaintiff was unaware that the Contract was an ID/IQ. Commenting on Travel Centre's admission that the federal agencies were not required to use its services, the Federal Circuit in *Travel Centre* noted that " ... the language in the IDIQ contract alone is sufficient to conclude that Travel Centre could not have had a reasonable expectation that any of the government's needs beyond the minimum contract price would necessarily be satisfied under this contract." 236 F.3d at 1319, n. 1. Plaintiff admits that the government purchased the Contract minimum and admits that the government's obligation under an indefinite quantity contract is to order the stated minimum quantity, and when it does so its legal obligation in that regard is ordinarily satisfied. Pl. Opp., pp. 3, 17. Given the clear language of the Contract, after purchasing at least the $50,000.00 minimum under the Contract, the government's obligations thereunder were satisfied and plaintiff had no further rights thereunder. Thereafter as explained in *Travel Centre*, the government was free to purchase from "any other source it chooses." For the purposes of considering the pending motion for summary judgment only, plaintiff's allegation that the services provided under subline item 001GGD, application of a water based vinyl acrylic product applied by an airless sprayer, was the same as that subsequently provided under subline item 001GGE is presumed to be true. Regardless, after satisfying the Contract minimum, the government had no further obligation to pay plaintiff $5.00 per square foot for that service. As the government was free to purchase additional asbestos-related services from any other party, it could, and did, contract with plaintiff for additional services, albeit at a different price. There is nothing in this IDIQ contract that requires all asbestos encapsulation be at $5.00 per square foot.[24] The court rejects

---

24. Plaintiff's Opposition suggests that rather than issue Modification P00007, the unit price for encapsulation under 001GGD could have been adjusted under the Variation in Estimated Quantities clause. Pl. Opp. p. 4. That clause,

contained in FAR § 52.212–11 (1993), permits a fixed-price contract to incorporate by reference its terms which authorize an equitable adjustment of the contract price if the actual quantity of a unit-priced item is 15 percent above or

plaintiff's attempt to morph the Contract from an ID/IQ to a requirements contract. The Contract was indisputably an ID/IQ contract. The government did not act contrary to its contractual commitments; accordingly, there was no breach.

### Validity of Modification P00007 and its Release

Alternatively, the court looks at Modification P00007 with its release and finds it to be valid, not the product of undue economic duress. In addition to contracting for an additional $11,500.00 in services that plaintiff subsequently provided, Modification P00007 contained a release which the government asserts is an accord that was satisfied and bars any claim plaintiff may have based on the Contract.

> The foregoing is agreed to as constituting full and complete equitable adjustment and compensation attributable to the facts or circumstances giving rise to this change including but not limited to, any changes, differing site conditions, suspensions, delays, rescheduling, acceleration, impact or other causes as may be associated therewith.

Pl.App. 185.

Plaintiff asserts Modification P00007 is not a valid accord and satisfaction because there was no bona fide dispute between the parties—the Navy just didn't want to pay the Contract price for encapsulation, there was no consideration given by plaintiff, and there was no meeting of the minds. Plaintiff also avers Modification P00007 was signed under economic duress and was originally signed with a notation of objection to the reduction in square footage charge, a reservation that was removed at the insistence of the Navy's contracting officer. The court will address these points in turn. While a finding of an accord and satisfaction is not necessarily

below the estimated quantity. A fixed-price contract is not however before the court. Furthermore, while neither party points to any incorporation of this clause in the Contract, the court notes the Variation in Estimated Quantities clause is one of several FAR clauses that were available for incorporation by reference. Pl.App. 188. That clause, however, does not appear in the Solicitation or Amendments 0001 or 0002. Pl.App. 010–016.

based on the court's finding that the Navy did not breach the ID/IQ contract and was free to offer, as it did, to purchase additional services from plaintiff in Modification P00007, the court will nevertheless examine the argument. Assuming that the confines of the Contract still applied, and further assuming plaintiff was entitled to be paid $5.00 per square foot for additional encapsulation services, Modification P00007 is a valid accord and satisfaction, not tainted by undue economic duress.

▮ Accord and satisfaction discharges a claim when " 'some performance different from that which was claimed as due is rendered and such substituted performance is accepted by the claimant as full satisfaction of his claim.' " *O'Connor v. United States,* 308 F.3d 1233, 1240 (Fed.Cir.2002)(quoting *Case, Inc. v. United States,* 88 F.3d 1004, 1011 n. 7 (Fed.Cir.1996)) (quoting *Cmty. Heating & Plumbing Co. v. Kelso,* 987 F.2d 1575, 1581 (Fed.Cir.1993))(citing *Brock & Blevins Co. v. United States,* 170 Ct.Cl. 52, 343 F.2d 951, 955 (1965)). Accord and satisfaction has four prerequisites: (1) proper subject matter; (2) competent parties; (3) a meeting of the minds of the parties; and (4) consideration. *Id.* In its most common form, an accord and satisfaction is "a mutual agreement between the parties in which one pays or performs and the other accepts payment or performance in satisfaction of a claim or demand which is a bona fide dispute." *Nev. Half Moon Mining Co. v. Combined Metals Reduction Co.,* 176 F.2d 73, 76 (10th Cir. 1949). *See also Tri–O, Inc. v. United States,* 28 Fed.Cl. 463, 469 (1993)(a release of preexisting claims by an accord and satisfaction is the " 'rendering of some performance different from that which was claimed as due and the acceptance of such substituted performance by the claimant as full satisfaction' ").[25]

25. Cases must be carefully examined. Some cases refer to acceptance of performance different from that claimed by the other party to be due as a discharge of prior claims. Other cases refer to acceptance of payment different from that allegedly due. As here, the dispute was over amount not performance, plaintiff's reliance on quoted authority as to the former is not support for its argument there was no accord and satis-

The "satisfaction" segment was met in the performance of the Modification—the plaintiff providing services and the government paying for the same under subline item 001GGE. *Thomas Creek Lumber v. United States*, 36 Fed.Cl. 220, 238 (1996). *See also Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1394 (Fed.Cir.1987)(a claim not specifically delineated in an exception to a release is thereafter barred).

■ Plaintiff insists that there was no bona fide bilateral dispute prior to the execution of Modification P00007. The government just didn't want to continue to pay $5.00 per square foot for asbestos encapsulation but could not differentiate between "encapsulate" and "encapsulate with lockdown" plaintiff argues. The court disagrees. As plaintiff admits, "the facts as to whether the scope of work under the two subline items is the same scope of work is genuinely disputed by the parties, . . ." Pl. Opposition at 8. That same "dispute" preceded the signing of Modification P00007. A disagreement is still a disagreement even if both sides assert they are right and the other side wrong.

Assuming the truth of plaintiff's factual assertion, the undisputed facts reveal at least two disagreements. First, the Navy wanted to pay $0.23 per square foot; plaintiff wanted $5.00 per square foot; secondly, the Navy believed (correctly as the court has noted) that its contractual obligations had been fulfilled; plaintiff believed it was entitled to the Contract price. The record as recited above reflects not only this dispute but the unanticipated increase in the amount of asbestos surface area to be remediated, whether by encapsulation or encapsulation with lockdown. Mr. DeVaughn wrote to the Navy in a July 26, 1994 letter: "[y]ou have proposed adding a subline item called 'Lockdown Encapsulant.' Preliminary negotiations were conducted in early April to reach an agreeable price. Before we can conclude negotiations for this item, we request that you provide clarification." Def.App. 211. There was a dispute.

Plaintiff's cited cases do not advance its position but rather support the existence of a

*faction because its performance (encapsulation)*

valid accord. *Thomas Creek Lumber v. United States*, 36 Fed.Cl. 220 (1996) explained that " '[t]he doctrine of 'accord and satisfaction denotes "one of the recognized methods of discharging and terminating an existing right" ' as set forth in a preexisting contract; it 'constitutes "a perfect defense in an action for the enforcement of a previous claim," ' " *regardless of the merits of such a claim.*" 36 Fed.Cl. at 237, citing *Chesapeake & Potomac Telephone Co. v. United States*, 228 Ct.Cl. 101, 108, 654 F.2d 711, 716 (1981)(quoting 6 Corbin on Contract § 1276 (1962)). Here, even if plaintiff had a preexisting contract right to be paid $5.00 per square foot for services in excess of both the minimum and maximum subline item (a position to which the government took exception), Modification P00007 extinguished any such right and constitutes a "perfect defense" to plaintiff's attempt to enforce that prior claim. Moreover, the bona fide dispute must have existed or been asserted prior to the execution of the Modification—here, the "accord." *Id.* at 238. Undisputed material facts memorialize the government's position that no further work under subline item 001GGD, was going to be ordered and plaintiff's position that such work fell under that subline item number for which plaintiff should be paid for $5.00 a square foot. This impasse led to Modification P00007. Likewise *Green Management Corp. v. United States*, 42 Fed.Cl. 411, 431 (1998) applied well-recognized principles not inconsistent with the court's conclusions herein. (" 'An accord is an agreement by one party to give or perform and by the other party to accept, in settlement or satisfaction of an existing or matured claim, something other than that which is claimed to be due' ")(citing *Chesapeake & Potomac*, 654 F.2d at 711).

■ With respect to its assertion of economic duress, plaintiff alleges that the government threatened that no further work or delivery orders would be issued under the Contract and that asbestos removal work would be given to others. Plaintiff also alleges that the threat of no further delivery orders under the Contract would have had a devastating impact upon plaintiff, which had

*was the same under both subline items.*

its bonding capacity tied up with this Contract. DeVaughn Aff. ¶¶ 26, 31. Assuming the truth of these allegations for the purposes of this motion for summary judgment only, they do not rise to economic or other coercion sufficient to void Modification P00007. Economic duress can void an otherwise valid accord and satisfaction. *Systems Tech. Assoc., Inc. v. United States*, 699 F.2d 1383, 1387 (Fed.Cir.1983). However, there are three requirements for a claim of economic duress, each of which must be satisfied: (1) involuntary acceptance of the terms of another; (2) no other reasonable alternative was available under the circumstances; and (3) the circumstances were the result of coercive acts of the government. *See Rumsfeld v. Freedom NY, Inc.*, 329 F.3d 1320, 1329 (Fed.Cir.2003); *Dureiko v. United States*, 209 F.3d 1345, 1358 (Fed.Cir.2000)(Hurricane Andrew, not government coercion, was the cause of the contractor's duress); *Employers Ins. of Wausau v. United States*, 764 F.2d 1572, 1576 (Fed.Cir.1985); *Technology Associates, Inc. v. United States*, 699 F.2d 1383, 1387 (Fed.Cir.1983). Economic pressure or the threat of considerable financial loss is not sufficient. *Rumsfeld*, 329 F.3d at 1330. *See also C.W. Over & Sons, Inc. v. United States*, 48 Fed.Cl. 342, 349 (2000); *Green Management Corp. v. United States*, 42 Fed.Cl. 411, 438 (1998)(holding that contractor's acceptance of modification after government's threat of termination was not due to duress). As plaintiff admits, it is the conduct of the government and not the contractor's necessities that are examined. Thus, as the Federal Circuit recently explained in *Rumsfeld*, 329 F.3d at 1330: "coercion requires proof of wrongful action by the government." *Rumsfeld* defined requisite wrongful action:

> In summary, coercion requires a showing that the government's action was wrongful—*i.e.*, that it was (1) illegal, (2) a breach of an express provision of the contract without a good-faith belief that the action was permissible under the contract, or (3) a breach of the implied covenant of good faith and fair dealing.

329 F.3d at 1329, citations omitted.

In *Rumsfeld*, the government, aware of the contractor's deep financial distress, withheld a progress payment solely to pressure the contractor into signing the Modification. While the contract allowed progress payments to be withheld under certain circumstances, pressure to sign a Modification was not among them. As a result, the Federal Circuit invalidated the Modification on the grounds of duress. Here, the government actions plaintiff relies upon were not coercive.

Plaintiff alleges the Navy withheld payments due, omitted subline item 001GGD from delivery orders and threatened to omit any encapsulation work from future delivery orders, knowing that plaintiff would have to perform the work anyway in order to comply with state and federal regulations,[26] withheld any further delivery orders, threatened contract funding would be cut-off and no more delivery orders would be issued, and hired another contractor and threatened to hire other contractors for future work. Pl. Opp. at 14. Plaintiff asserts material factual issues as to the duress surrounding the signing of the Modification precludes summary judgment. However, as the court has found, after ordering the Contract minimum, the government had no further obligations to issue any more Delivery Orders to plaintiff. Thus, assuming the truth of plaintiff's allegations, with the exception of alleged withholding of payments, the government was within its rights under the Contract and did not engage in wrongful coercive conduct. *Rumsfeld*, 329 F.3d at 1330 ("'The assertion of a legitimate contract right cannot be considered as violative of a duty of good faith and fair dealing,' and thus cannot be coercive")(citing *David Nassif Assoc. v. United States*, 226 Ct.Cl. 372, 644 F.2d 4, 12 (1981) and *Johnson, Drake & Piper v. United States*, 209 Ct.Cl. 313, 531 F.2d 1037, 1043 (1976))(not duress for government to threaten terminate under the contract). As for the remaining allegation, as the government points out, plaintiff provides no factual support for its allegation in its Opposition to the government's Motion for Summary Judg-

---

**26.** Plaintiff's Complaint does not seek damages for encapsulation work that was not ordered but performed by plaintiff in order to comply with state or federal requirements.

ment that payments were withheld. The government represents it is unaware of any withheld payments. Def. Reply, p. 6, n. 3. The court notes that plaintiff's Complaint asserts that the Navy threatened not to issue any further work under the Contract and/or that the Contract would be terminated for convenience and held-up two delivery orders (all of which the government was entitled to do under the Contract). Compl. ¶¶ 16, 19. Mr. DeVaughn testified that he was told he would not be paid unless he billed completely when he performed the contract. Def.App. 193, DeVaughn dep., p. 102, ll. 1–12. As the government notes, the Contract did not permit partial billing of a delivery order of $25,000 or less.[27] Plaintiff has not proffered (and supported) any material fact that would preclude defendant's motion for summary judgment that Modification P00007 with its release was a valid accord and satisfaction.[28] However, as described,hereinafter, even if Modification P00007 was tainted by economic coercion, subsequent releases signed by plaintiff for which no coercion is alleged, discharge plaintiff's claims.

Plaintiff also asserts there was no meeting of the minds on Modification P00007 because of the government's economically coercive acts citing *Emerson–Sack–Warner Corp. v. United States*, 189 Ct.Cl. 264, 416 F.2d 1335 (1969). In *Emerson*, the court found a modification did not eliminate a contractors' right to seek reimbursement for costs. In *Emerson*, after the contract to provide weather tight first aid boxes was signed, the parties realized a specific definition of "weather tight" was lacking from the specifications. While the specifications required testing the boxes with a water hose at 25 pounds of pressure, water resistant testing standards

such as the duration of the test or the distance of the hose were missing. To clarify and supply the missing specification detail, a modification with test criteria was developed. The contractor modified the first aid box and informed the government of its costs in doing so. Responding that the additional cost was exorbitant, the government relaxed the test criteria to allow the permeation of a specific but small amount of water into the boxes. The contractor complained about cost and delay. The government warned the contractor that if the modification was not signed, action would be taken to terminate the contract for default. The modification, which did not appear to have a release provision, was subsequently signed. The contractor sought an equitable adjustment for its costs of research and development. The government objected arguing the modification was an accord and satisfaction. The court disagreed, finding the modification was plainly not " 'a mutual agreement in satisfaction of a claim or demand which is a bona fide dispute.' " At most, there was agreement that " 'a change was necessary in order to achieve performance of the contract.' " The government's threat that the contract would be terminated for default was not cited. The case does not support plaintiff's assertions.

Plaintiff argues the Modification lacked consideration because plaintiff performed the same work that was called for under 001GGD for which it had been paid $5.00 per square foot, thus it "gave" nothing. The court disagrees. Having fulfilled its contractual obligations, the government negotiated and ordered additional services from plaintiff for which plaintiff received additional remuneration. Absent the Modification, plaintiff had

---

**27.** The Contract provided:

1.7.3 INVOICES:
1.7.3.1 Invoicing for delivery orders $25,000 or under: The Contractor shall submit a first and final invoice for each individual delivery order on NAVFAC Form 4330/30, "Contractor Invoice Form" upon successful completion of all work. Invoices shall identify the contract number and individual delivery order number and shall be complete and accurate. Upon receipt of the invoice by the Contracting Officer, the work will be verified for successful completion and the invoice will then be promptly processed for payment. Invoices

submitted incorrectly or for an accumulative number of delivery orders will be returned for correction and resubmission. Invoices of less than $25,000 shall be submitted for each delivery order separately.
Def. Ap. 213.

**28.** Plaintiff's reliance on *Spalding and Son, Inc. v. United States*, 24 Cl.Ct. 112 (1991), the hearing officer's report and recommendation in a Congressional Reference case, is misplaced. The recommendation was subsequently rejected by a three-judge panel. *Spalding & Son v. United States*, 28 Fed.Cl. 242, 248 (1993).

no right to further Delivery Orders and the government had no obligation to provide such. Modification P00007 was supported by bilateral consideration—the government agreeing to buy services and plaintiff agreeing to provide those services—after the rights and obligations of the original Contract in this respect had been satisfied.[29] Furthermore, even if Modification P00007, itself an IDIQ contract, lacked mutuality of obligation, subsequent performance filled that void, rendering the contract enforceable to the extent it was performed. *See Fed. Elec. Corp. v. United States,* 202 Ct.Cl. 1028, 486 F.2d 1377, 1381 (1973)("[a]n indefinite quantity government contract, unenforceable at its inception due to a lack of mutuality of obligation, became valid and would be enforced to the extent it was performed,") citing *Willard, Sutherland & Co. v. United States,* 262 U.S. 489, 493–94, 43 S.Ct. 592, 67 L.Ed. 1086 (1923). *See also United Mgmt., Inc. v. Dep't of the Treasury,* GSBCA 20796, 97–1 BCA ¶ 28,751, 1996 WL 734425 (in the absence of a stated minimum, an indefinite quantity contract is unenforceable for lack of consideration except to the extent performed).

Accordingly, Modification P00007 is valid and plaintiff's claim for breach based on the price differential for encapsulation services fails as a matter of law.

In arguing against the validity of Modification P00007 and its release, plaintiff also alleges that at the time of signing, Mr. De-Vaughn placed an asterisk next to his signature and a note "see attached." On that separate attachment Mr. DeVaughn, referencing his asterisk, stated that he was signing the Modification at the Navy's request in order for the contract to move forward, and that he reserved all of plaintiff's rights to argue subline item 001GGE was already included in the Contract under subline item 001GGD. DeVaughn Aff. ¶ 32. The Navy wanted the Modification signed because it was holding up pending delivery orders that the Navy wanted to issue before September 30, the end of the fiscal year, otherwise funding would be lost. *Id.* When the provisionally signed Modification P00007 was presented, Mr. De Vaughn was told by the then Contracting Officer, Marie King, that deviations to the standard Navy form were unacceptable.[30] Accordingly, based on that representation, Mr. DeVaughn discarded the reservation and blotched out the asterisk and the "see attached" notation from the signature block of the Modification. *Id.* Plaintiff's unqualified signature on the Modification was forwarded to the Contracting Officer who signed it on August 23, 1994. Pl.App. 192. Assuming the truth of these allegations, they are not sufficient to invalidate plaintiff's signature to Modification P00007. *See Am–Pro Protective Agency, Inc. v. United States,* 281 F.3d 1234, 1241–43 (Fed.Cir.2002)(finding contractor's affidavit of government threats insufficient to create a genuine issue of material fact). Furthermore, even if plaintiff's reservations and objections were preserved, the court has rejected them. After agreeing to a lesser amount to gain more work, plaintiff was simply not entitled to be paid $5.00 a square foot for the additional encapsulation services.

The government is entitled to judgment as a matter of law on Count One of plaintiff's Complaint that seeks to recover $193,800.88, the difference between $0.23 per square foot paid and the $5.00 per square foot plaintiff asserts it was entitled to be paid for post-Modification P00007 services. The government's obligations and plaintiff's right to the $5.00 amount under the Contract were fully satisfied when the government ordered and paid for the Contract minimum. As for Modification P00007, there is no question that Kevin DeVaughn, plaintiff's president, and the contracting officer who signed Modification P00007 were competent and had the necessary authority to sign. Plaintiff's de-

---

29. Mr. DeVaughn testified that the waiver in Modification P00007 was ". . . an attempt to . . . close this issue out once and for all and that, with respect to the work that's identified, it is a language to waive any future plans or causes of action." Def.App. at 194 [DeVaughn dep., p. 126, ll. 24–25, p. 27, l. 1–3].

30. Ms. King, the contracting officer, could not remember if this conversation took place. Pl. Statement of Proposed Findings No. 116 and Def. Response.

fenses thereto fail as a matter of law. Accordingly, "renegotiation" of the square footage price for the additional services provided by plaintiff did not breach the Contract and the price for subline item 001GGE in Modification P00007 was not invalid.

The court's finding that the government satisfied its contractual obligation by ordering the Contract minimum also precludes the other breaches alleged by plaintiff of (1) "improperly issuing delivery orders without subline item 001GGD," Compl. ¶ 24(a); (2) "interpreting the term of the contract to be for only one year," Compl. ¶ 24(e); (3) "improperly limiting delivery orders to one year under the contract," Compl. ¶ 26(a); and (4) "needlessly tying up ACC's bonding capacity for the second year of the contract when there were no delivery orders issued in the second year." Compl. ¶ 26(b).

**Releases for subline item 001GGE work**

■ Even if Modification P00007 and/or its release were found to be invalid for any of the reasons plaintiff suggests, plaintiff's claims that it should have been paid $5.00 a square foot for this work were released again in subsequent Delivery Orders or Modifications to those Delivery Orders for subline item 001GGE work, the validity and enforceability of which plaintiff offers no defense. A contractor who executes an unconditional general release and fails to exercise his right to reserve claims is barred from maintaining a suit for damages or additional compensation under the contract based on events that occurred prior to the execution of the release. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987); *Starflight Boats v. United States*, 48 Fed.Cl. 592, 602 (2001); *Clark Mechanical Contractors, Inc. v. United States*, 5 Cl.Ct. 84, 86 (1984); *J.G. Watts Constr. Co. v. United States*, 161 Ct.Cl. 801, 805, 1963 WL 8559 (1963). Therefore, in addition to plaintiff's claims for a higher square footage charge being unwarranted as a matter of law under

the Contract and under Modification P00007 and its release, those claims are also foreclosed as a matter of law under the subsequent releases.

**Inaccurate estimates**

■ Plaintiff's final claim is that the government breached the Contract by failing to accurately estimate the amount of encapsulation work that would be required at the Naval Academy. The court concludes that even if plaintiff were to prevail on this argument, however, such victory would be hollow as it would not change the Contract minimum. There is nothing is the record to suggest, much less support, a finding that even if the estimated quantity of subline item 001GGD had been 50,000 square feet (an appropriate estimate under plaintiff's theory) the government would have done anything other than what it did—decline to order $5.00 per square foot encapsulation services for more than the Contract minimum.

Plaintiff allegations concerning the government estimate are in Paragraph 21 of the Complaint:

> ... no written work load figures or estimates were prepared or utilized by the Navy as a basis for the Navy's quantity estimates advertised in [sic] solicitation and utilized in the contract awarded to ACC [plaintiff]. In addition, no written analysis or review of historical quantity needs were prepared by the government or existed for review. In fact, the Navy made no effort to meet FAR requirements in developing realistic estimated quantities "based on the most current information available."

Compl. ¶ 21.

Plaintiff points out that the estimated quantities were originally part of what was to be a requirements contract, an assertion supported by the record. Under FAR § 16.503(a)(3),[31] estimated quantities in a re-

---

**31.** The 1993 regulation, FAR § 16.503(a)(1), pertaining to requirement contracts provides:

> For the information of offerors and contractors, the contracting officer shall state a realistic estimated total quantity in the solicitation and resulting contract. This estimate is not a representation to an offeror or contrac-

tor that the estimated quantity will be required or ordered, or that conditions affecting requirements will be stable or normal. The contracting officer may obtain the estimate from records of previous requirements and consumption, or by other means, and should

quirements contract should be realistic and "based on the most current information available." Pl. Opp. p. 18. Through amendment, the Solicitation became one for an indefinite quantity contract, governed by FAR § 16.504(a)(1) [32] which provides that the maximum should be realistic and based on the most current information available. Plaintiff asserts the Navy did "not come close to meeting this standard." Assuming the truth thereof, plaintiff proffers in its Proposed Findings of Uncontroverted Material Facts, that on June 24, 1985, the Navy's Chief of Naval Operations directed various Naval facilities, including the Naval Academy, to identify buildings containing certain types of asbestos. The importance of an asbestos inventory to be completed within four years was emphasized in a November 4, 1986 letter. A 1992 audit found deficiencies including the lack of a comprehensive asbestos survey/inventory or an Operation and Maintenance ("O & M") Plan. Pl. Statement of Proposed Findings No. 121–25. The Navy did not develop a comprehensive asbestos survey or inventory of the Naval Academy nor an O & M plan. *Id.* Nos. 122–27. The estimated quantities for subline item 001GGD for the Solicitation were obtained by the Navy from "[h]istorical data from previous contracts and educated estimates for future work, based upon job knowledge and experience and upon the most current information available ...." *Id.* No. 131. The Navy's planning and estimating supervisor could not explain standard procedures used to prepare estimated quantities and he did not review the Contract to determine whether or not individual line item quantity estimates were reasonable. *Id.* Nos. 132–37. The Navy's planner/estimator at the time of the Contract responsible for preparing the task orders and line items used in issuing Delivery Orders had no knowledge of the quantity estimates for any of the line items. *Id.* Nos. 138–40. No work load figures of

estimated quantities were prepared, no written analysis or review of historical quantity needs were prepared, and there were no backup for the government's estimated quantities in the Solicitation. *Id.* Nos. 141–47. The requirements contract preceding the Contract awarded to plaintiff contained a subline item 001GGD, "[e]ncapsulate loose asbestos dust, debris or waste with or without scaffolding." The estimated quantity was 37 square feet, the quantity used in the Solicitation and the Contract awarded to plaintiff. *Id.* Nos. 147–48. In sum, the Navy simply used the square footage from a prior contract.

Plaintiff relies heavily on *Schweiger Const. Co., Inc. v. United States,* 49 Fed.Cl. 188 (2001), that the government cannot hide behind its Contract minimum mantra but bears some responsibility for its estimates. According to plaintiff, " 'courts *will* evaluate the accuracy of estimates in the face of more egregious conduct by the government, rising to the level of 'bad faith.' '" Although it is true that courts "will not examine the reasonableness of such estimates in the face of allegations of negligence, in the IDQ contract context courts will examine the estimates in instances of more egregious governmental conduct." Pl. Opp. at 18, quoting *Schweiger Const. Co., Inc.,* 49 Fed.Cl. at 197. "Egregious conduct," "beyond mere negligence, and rising to the level of 'bad faith' " are cited as the measure of culpability that would trigger a breach of contract action. *Id.* Plaintiff reasons that there are material factual issues as to whether the government's conduct in establishing Contract estimates here went beyond mere negligence or indifference.

The Federal Circuit, however, in *Travel Centre v. Barram,* 236 F.3d 1316 (Fed.Cir. 2001) rejected the contractor's claims that actual federal agency travel management

---

base the estimate on the most current information available.

**32.** FAR § 16.504(a)(1) (1993), pertaining to indefinite quantity contracts provides:

The contract shall require the Government to order and the contractor to furnish at least a stated minimum quantity of supplies or services and, if and as ordered, the contractor to

furnish any additional quantities, not to exceed a stated maximum. The contracting officer may obtain the basis for the maximum from records of previous requirements and consumption, or by other means, but the maximum quantity should be realistic and based on the most current information available.

services usage for a prior year (which the court treated as an estimate) from which bids for an ID/IQ contract were to be computed was inaccurate or misleading because the government failed to disclose a material fact that several major government customers would not be using the travel management service. The Federal Circuit held that regardless of the accuracy of the estimate, plaintiff had no reasonable expectation of receiving any more than the contract minimum.

> Regardless of the accuracy of the estimates delineated in the solicitation, based on the language of the solicitation for the IDIQ contract, Travel Centre could not have had a reasonable expectation that any of the government's needs beyond the minimum contract price would necessarily be satisfied under this contract.

236 F.3d at 1319. *See also Dot Systems, Inc. v. United States*, 231 Ct.Cl. 765, 769, 1982 WL 25218 (1982)(indefinite quantity contractor cannot expect government estimates to be as accurate as in requirements or fixed price contract). Interestingly, the Federal Circuit's *Travel Centre* opinion is dated January 4, 2001. *Schweiger Construction Co.* was originally filed on January 5, 2001 as an unpublished opinion and was published on March 9, 2001. Therefore, *Schweiger* is not mentioned in the *Travel Centre* opinion. *Travel Centre* is binding on this court and compels the rejection of plaintiff's claims concerning the Navy's lack of an accurate estimate of encapsulation work.

Even if the court were to apply the *Schweiger Const.* standard, plaintiff's proffered facts do not rise to "egregious conduct," "beyond mere negligence, and rising to the level of 'bad faith.'" The Navy's failure to conduct an asbestos inventory despite being directed to do so, inability to explain how the 37 square feet of subline item 001GGD was computed, and use of that estimate in this Solicitation because it was

used in a prior contract, while possibly negligent, do not meet the *Schweiger Const.* standard. Accordingly, even assuming the truth of plaintiff's facts, and applying *Schweiger Const.*, plaintiff's burden has not been met and there was no breach of contract.[33]

For the foregoing reasons, it is **ORDERED** that:

(1) Defendant's Motion for Summary Judgment, filed February 14, 2002, is **GRANTED**;

(2) This ruling resolves all pending motions and requires the entry of final judgment **DISMISSING** the Complaint.

(3) **NO COSTS** shall be assessed.

---

**33.** Because of the court's findings, it is not necessary to examine or resolve the respective burden of proof of culpability, particularly plaintiff's contention that the "well-nigh irrefragable proof" of bad faith on the part of the Government has changed and the standard is simply "clear and convincing," and the government's position that the "clear and convincing standard most closely approximates the language traditionally used to describe the burden for negating the good faith presumption; namely the 'well-nigh, irrefragable proof standard.'" *Am–Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239–40 (Fed.Cir.2002).